POMPEI WINERY, d. b. a. PIONEER WINE COMPANY, Appellant, v. BOARD OF LIQUOR CONTROL, Appellee.

Ohio Appeals, Second District, Franklin County.

No. 5466. Decided December 5, 1956.

Frank V. Opaskar, Cleveland, for appellant.
Anthony R. Fiorette, Cleveland, Amicus Curiae, for appellant.
C. William O'Neill, Atty. Genl., S. Noel Melvin, Asst. Atty. Genl., Columbus, for appellee.
Isadore Topper, George B. Hinde, Columbus, Robert N. Gorman, Cincinnati, Amici Curiae, for appellee.

(DEEDS and FESS, JJ, of the Sixth District; HUNSICKER, PJ, of the Ninth District, sitting by designation in the Second District.)

## OPINION

By DEEDS, J.

This is an appeal on questions of law from a judgment of the Court of Common Pleas, affirming the order of the Board of Liquor Control suspending the Class A-2, B-4 and B-5 permits of appellant by reason of the sale of wine by appellant at prices in violation of the regulations of the Board, fixing minimum prices at which wine should be sold in the State pursuant to §4301.13 **R. C.**

The appellant has filed its assignments of error as follows:

"1. The judgment of the court is contrary to law.

"2. The judgment of the court is contrary to the weight of the evidence.

"3. The court erred in holding §4301.10 R. C., constitutional pursuant to which the appellant was charged and found guilty.

"4. The court erred in holding Article VII, Sections 1, 2 and 3, etc., of the Regulations of the Board of Liquor Control constitutional and not arbitrary and unreasonable, upon which section the charges in this case were based.

"5. The court erred in holding §4301.10 R. C., and Article VII, Sections 1, 2, 3, etc., constitutional.

"6. The court erred in holding said Article VII, Sections 1, 2, 3, etc., constitutional and not in violation of the interstate commerce clause of the Constitution of the United States of America, being Article I, Section 8 thereof.

"7. All other errors appearing in the record."

The appellant, The Pompei Winery, Inc., will be referred to hereinafter as the appellant and the appellee State of Ohio Board of Liquor Control as the Board.

The charges presented by the Board against the appellant were as follows:

"Violation No. 1. On August 3, 1954, and on numberous subsequent dates, you and/or your agent or employe, did sell and distribute in Ohio, to retail permit holders, bottled wine, at a price less than the 'minimum wholesale price' fixed by the Board of Liquor Control for the size of the container, class, type or kind of wine—in violation of the provisions of the Liquor Control Act and the regulations of the Board of Liquor Control.

"Violation No. 2. On October 13, 1954, you and/or your agent or employee, did prevent, hinder and obstruct investigators of the Department of Liquor Control from making an inspection of the business operation while in the performance of their duty—in violation of the provisions of the Liquor Control Act and the regulations of the Board of Liquor Control."

A stipulation was made between counsel for the parties at the hearing before the Board in which it was stipulated:

"It is hereby stipulated and agreed by and between counsel for the permit holder and counsel for the Director of the Department of Liquor Control, The Pompei Winery, Incorporated, is the holder of Class A-2, B-4 and B-5 permits, issued by the Department of Liquor Control; that The Pompei Winery, Incorporated, did sell and distribute in Ohio to retail permit holders, bottled wine in the quantities and at the price, and on the dates, and to the retail permit holders indicated on invoices marked as 'Department's Exhibit A' which exhibit consists of forty-one invoices."

It appears from the invoices referred to and marked as "Department's Exhibit A" that the appellant made 41 separate sales of wine at wholesale, to retailers at prices below the minimum price fixed by the Regulation of the Board.

The Board found the appellant guilty on the two charges as same

appear above and suspended the permits of appellant for a period of 15 days on each charge, the same to be served concurrently.

The Court of Common Pleas in the appeal from the order of the Board, affirmed the finding and order of the Board as to charge Number One involving sales of wine by appellant at prices in violation of the minimum price as fixed by the Board and reversed the finding and order of the Board finding the appellant guilty on charge Number Two for the reason that the evidence was insufficient to support the finding on that charge.

Sec. 6064-3a GC, 123 Laws of Ohio, pp. 359, 360 (now §4301.13 R. C.), as originally enacted, including preamble is as follows:

"(Amended Substitute Senate Bill No. 159)

"AN ACT

"To provide for the sale of bottled wine under fair trade regulations and for that purpose to authorize the Board of Liquor Control to adopt such regulations, and to enact supplemental §6064-3a GC.

"Be it enacted by the General Assembly of the State of Ohio

"Section I. That §6064-3a GC be enacted to read as follows:

"RULES AND REGULATIONS FOR SALE OF BOTTLED WINE:

"SCHEDULE OF PRICES FILED WITH DEPARTMENT, WHEN: MINIMUM MARK-UP PRICES.

"Sec. 6064-3a GC. The Board of Liquor Control shall have the power to adopt, promulgate, repeal, rescind, and amend rules and regulations to regulate the manner and method of dealing in and distributing and selling bottled wine within the state. The Board of Liquor Control may require out-of-state producers, shippers, bottlers, and holders of federal importers' permits shipping bottled wine into Ohio and holders of class A-2, B-5, B-3 and B-2 permits issued by the Department of Liquor Control engaged in distributing and selling bottled wine in Ohio, to file with the Department of Liquor Control a schedule of prices in which minimum prices are set forth for the sale of bottled wine at wholesale or retail, or both, in Ohio. Any amendments, additions, alterations, or revisions to the schedule of prices as originally filed with the Department of Liquor Control shall be filed in the same manner as the original schedule of prices required to be filed with the Department of Liquor Control.

"The Board of Liquor Control may determine and fix the minimum mark-ups at wholesale or retail, or both, for bottled wine, and fix the minimum prices at which the various classes of bottled wine shall be distributed and sold in Ohio either at wholesale or retail, or both."

Sec. 4301.13 R. C., involved in a consideration of this appeal, with changes made in the wording of the law as quoted above, is as follows:

"The Board of Liquor Control may adopt, promulgate, repeal, rescind, and amend rules and regulations to regulate the manner of dealing in and distributing and selling bottled wine within the state. The board may require out-of-state producers, shippers, bottlers, and holders of federal importers' permits shipping bottled wine into Ohio and holders of A-2, B-5, B-3 and B-2 permits issued by the Department of Liquor Control, engaged in distributing and selling bottled wine in Ohio, to file

with the department a schedule of prices in which minimum prices are set forth for the sale of bottled wine at wholesale, or retail, or both, in Ohio. Any amendments, additions, alterations, or revisions to the schedule of prices as originally filed with the department shall be filed in the same manner as the original schedule of prices required to be filed with the department.

"The board may determine and fix the minimum mark-ups at wholesale or retail, or both, for bottled wine, and fix the minimum prices at which the various classes of bottled wine shall be distributed and sold in Ohio either at wholesale or retail, or both."

Article VII of Regulation 3 states the purpose for the fixing of prices at which wine may be sold in the State:

"Article VII, MINIMUM PRICE.

"This article is promulgated pursuant to the provisions of §6064-3A GC (§4301.13 R. C.), to avoid economic and social consequences which flow from unfair competition and improper practices in the sale and distribution of alcoholic beverages. It is hereby declared to be the policy and intent of the Board, in promulgating this Article to advance the social control of an alcoholic beverage and to stabilize the sale and distribution of bottled wines in Ohio which cause intemperance and improper usage of bottled wines."

Section 1, Article VII of Regulation 3 provides as follows:

"Section 1. In determining the 'minimum wholesale price' at which bottled wine, except champagne, sparkling wines and apertif wine, shall be sold or distributed in Ohio by the holders of A-2, B-5 and B-2 permits for resale to holders of C-2, D-2, D-3, D-3a, D-4 or D-5 permits, the Board will take into consideration and will be guided by the current selling price of wine in bulk in California, the current selling prices for California wines in bulk in the principal markets of the United States, the charges for the necessary transportation and delivery of wine in bulk from the place of origin to Ohio, all taxes and assessments and levies on wine (both federal and state or states), and the general prevailing cost of labels, containers, crowns, caps and seals. The cost so determined will be termed the 'prevailing cost' of such wine bottled in Ohio and there will be added to the cost above referred to, a bottling cost mark-up of 16% (sixteen per cent) of such 'prevailing cost' and which price so determined will be termed the 'minimum base cost.' The 16% mark-up is to cover in part, but without limitation, the cost for such items as labor, salaries of executives and officers, rent, depreciation and maintenance of equipment and property, selling costs, insurance, license fees, property taxes, delivery charges (if any), shrinkage, breakage, evaporation and general overhead expenses. There will be added to the 'minimum base cost' of wine a wholesaler's mark-up of 20% (twenty per cent) of the 'minimum base cost,' which price will be deemed the 'minimum wholesale price' to Class C-2, D-2, D-3, D-3a, D-4 or D-5 permit holders and which mark-up is to cover in part, but without limitation, the cost of doing business by a distributor at wholesale of bottled wine for such items as labor, salaries of executives and officers, rent, depreciation, and maintenance of equipment and property, selling cost, insurance, license

fees, property taxes, delivery charge (if any), breakage and general overhead cost.

"The Board will fix as the 'minimum wholesale price' to Class C-2, D-2, D-3, D-3a, D-4 and D-5 permit holders for wine produced outside the United States and imported into Ohio, the same 'minimum wholesale price' as is fixed for wine produced or bottled in Ohio.

"The 'minimum wholesale price' to Class C-2, D-2, D-3, D-3a, D-4 and D-5 permit holders for wine produced in the United States, but bottled outside of Ohio, will be fixed by the Board to be the same as the 'minimum wholesale price' fixed for wine produced or bottled in Ohio."

Sections 2 and 3, Article VII, of Regulation 3, provide in detail and require all persons and firms engaged in the production, importation, sale and distribution of wine in the State of Ohio, to prepare and file schedules containing a description of product, prices and other data and information pertaining to the production, importation, sale and distribution of wine in the State.

The brief of counsel for appellant contains a statement of the issues involved in this appeal:

"This appeal involves the validity or constitutionality of §4301.10 A (7) R. C.. and the minimum price regulations of the Board of Liquor Control, Article VII, Section 1, 2, 3, etc., by virtue whereof it is sought to establish minimum prices for the sale of bottled wine in Ohio."

We take note that the above statement of counsel for appellant does not make reference to §4301.13 R. C., but instead makes reference to §4301.10 A (7) R. C., which provides:

"7. Inspect, upon demand, the books, accounts, records, memorandums, and place of business of any person subject to Chapters 4301. and 4303. R. C.. or the laws relating to the manufacture, importation, transportation, distribution, and sale of beer and intoxicating liquor, and the sale of alcohol."

We have noted hereinabove that the Court of Common Pleas reversed the finding and order of the Board in reference to the charge that the appellant hindered and prevented the investigator of the Board from making an inspection, consequently in our view sub-section A (7) of §4301.10 R. C., is not involved in this appeal, except as being a part of Chapters 4301 and 4303 R. C., which chapters contain the greater part of the laws of the State controlling and regulating the manufacture, importation, transportation, distribution and sale of beer and intoxicating liquor and the sale of alcohol in the State of Ohio. It is clear from a consideration of the assignments of error presented on behalf of the appellant that counsel did not intend to limit the issues as stated in the above quotation from brief of counsel.

The issues presented on this appeal as we consider them are that: Sec. 4301.13 R. C., is unconstitutional for the reason that it is beyond the police power of the State; fails to declare standards or a clear policy; is violative of the due process provisions of the State and Federal Constitutions, and also contravenes the commerce clause of the Federal Constitution.

Further, that Article VII of Regulation 3, Sections 1, 2, 3, etc., are

arbitrary, unreasonable and contrary to the policy authorized by the Legislature and are therefore invalid and unconstitutional.

It is the contention of counsel representing the office of the Attorney General on behalf of appellee Board, and also counsel as Amici Curiae, representing a considerable number of firms and various associations interested in the manufacture, sale and distribution of alcoholic beverages, that the issues involved in this appeal have been determined and are controlled by the decision of the Court of Appeals in this District in the case of **Blackman v. Board of Liquor Control, 95 Oh Ap 177** (1952), 113 N. E. 2d, 893, appeal dismissed as of right, 158 Oh St 348 (1952), 109 N. E. 2d, 281.

In our view, the headnotes in Blackman v. Board of Liquor Control, supra, state the issues and a determination of same with clarity, as follows:

"1. A statute which convers on an administrative board discretion to adopt subordinate rules, administrative in character, without establishing any standards for guidance, is not an unconstitutional delegation of legislative power where the discretion relates to a business carried on as a matter of privilege because of its character, such as dealing in intoxicating liquors, rather than an ordinary lawful business carried on as a property right.

"2. The provision of §6064-3a GC, empowering the Board of Liquor Control to 'determine and fix the minimum markups at wholesale or retail, or both, for bottled wine, and fix the minimum prices at which the various classes of bottled wine shall be distributed and sold,' without fixing any standards or rules for the guidance of the board, is not an unconstitutional delegation of legislative power, but states of minimum mark-ups and minimum prices for the sale of wine.

"3. Regulation 3, Article 7, of the Board of Liquor Control, establishing minimum prices for the sale of wine, is neither arbitrary nor unreasonable merely because the prices established fail to differentiate between the varying costs of wholesalers engaged in the same business and are fixed without the consideration of any factors incident to such costs."

Counsel for appellant, and also counsel representing a number of firms and associations, as Amici Curiae, in support of appellant, contend that the decision by the court in Blackman v. Board of Liquor Control, supra, did not determine and therefore does not control a determination of the issues presented on this appeal.

Counsel for appellant and counsel as Amici Curiae, in support of the contention that the decision in the Blackman case is not controlling and dispositive of the issues in this appeal, rely mainly upon statements in the opinion of the court in the Blackman case, that the court was in doubt as to whether the issues were properly before the court for determination and also that there was no evidence in the record bearing upon the claim that the Board, in fixing minimum prices failed to differentiate "between the varying costs of wholesalers engaged in the same business," etc. Blackman case, pp. 185, 186.

We take note and significant the statements referred to as they appear in the opinion in the Blackman case, that there was a lack of

any evidence in that case bearing upon the claim that the Board failed to consider the varying costs to wholesalers engaged in the same business in determining the minimum prices and also the statement "Although we pass on all questions briefed, we doubt if they are properly before this court," citing "Village of Clarington v. Althar, 122 Oh St 608, 174 N. E., 251."

It should be noted in considering the statement in the opinion in the Blackman case as to whether the questions were properly before the court, that the writer of the opinion in the Blackman case had stated previously in the opinion, p. 178, that "No claim of invalidity of the rule was urged before the board." Likewise, no claim of invalidity was made in the case at bar in the hearing before the board. It is considered appropriate to state here, considering the clear unequivocal announcement appearing in the headnotes as quoted above, that although there was no evidence on the question as to the difference in costs to wholesalers and a doubt whether the questions were properly presented for decision, we have no difficulty in reaching the conclusion that the court in deciding the Blackman case intended to and did, as stated, p. 186, "pass on all questions briefed," which in our view did comprehend the issues involved in this appeal.

Nevertheless, it is pertinent that the record now before us does contain testimony, also other evidence, and proffers relevant to the question of the so-called differential or variation in costs to wholesalers engaged in the same business and also that probably the record now before this court is more complete in presenting the issues to be determined, and that therefore this court should give further consideration in this opinion to the questions as same are presented by the record on this appeal.

It is contended further in part in this case, as stated by the Court of Common Pleas in affirming the finding and order of the Board:

"It is the contention of counsel for appellant that the method of determination of price is arbitrary in that it operates to the benefit of the out-of-state bottlers and to the detriment of the local bottlers and the purchasers, who are compelled to pay for local wines the same as wines brought in from out of the state, and are deprived of the benefit of the reduced costs and expenses incident to and connected with the operations by local bottlers.

"In other words, the local bottler is prohibited from passing on to the consumer the benefit of this lower cost of production and it is argued that this tends to destroy the local bottlers' business, since, if the price is the same, a preference for the imported and nationally advertised wine will be indicated by the consumer."

It is contended on behalf of the Board, in substance, that in promulgating Section 1, Article VII, of Regulation 3, the Board has prescribed the method to be pursued in determining and fixing the minimum prices at which bottled wine wherever produced or bottled may be sold either at wholesale or retail or both in Ohio.

It is emphasized further that in determining and fixing the minimum prices at which wine may be sold at either wholesale or retail, or both, the Board has taken as a basis from which it has arrived at the mini-

mum prices for wine "the current market price for bulk wine produced in California," for the reason as acknowledged generally that the State of California produces 85% or more of all the wine consumed in the United States.

It is contended further with logical support in reason, and not disputed, that by reason of the dominant position of the State of California in the production of wine, it is the only market area for wine in which prices are determined by a disinterested agency, as is the Federal-State Market News Service at San Francisco, which agency issues weekly bulletins and publishes reliable information concerning the current market prices for California bulk wine, and that therefore the current market price of California bulk wine is the natural basis from which to determine and fix minimum prices.

It is contended further, supported by analysis of the method pursued by the Board in determining and fixing the minimum prices at which bottled wine may be sold in Ohio, that the prices are not determined in an arbitrary or unreasonable manner, but are arrived at by a detailed consideration of the actual costs and expenses incurred in the bottling, transportation, distribution and sale of bottled wine in Ohio.

It is also emphasized that Section 1 of Regulation 3 fixes the minimum prices, below which, no bottled wine wherever produced or bottled may be sold in Ohio.

It is contended by the appellant that the regulation and action of the Board are arbitrary and unreasonable for the reason that Ohio bottlers of wine can and would, if permitted, avoid many of the costs incurred by the California bottlers, including transportation costs, greater costs for bottling in shipping, national advertising of their product, distribution costs, and other elements and factors whereby the Ohio bottler can sell bottled wine at a lower price and realize a fair profit, which would inure to and be of substantial benefit to the consumers of wine in Ohio.

It is emphasized that nationally-advertised wine of the California producers and bottlers gain a preference by reason of the public preference for nationally-advertised brands of wine and that unless the Ohio bottler is permitted to sell the product at a lower price, the Ohio bottler will be and actually is being eliminated and forced out of the wine business.

It is also argued forcibly that the purpose of the regulations as declared by the Board and quoted above is beyond the legitimate authority of the Board and is contrary to the declared purpose and policy of the Legislature as contained in the preamble to §4301.13 R. C. (§6064-3a GC), 123 Ohio Laws, pp. 359-60, which it is contended was authority to "provide for the sale of bottled wine under fair trade regulations," etc., and was not intended to promote the betterment of social conditions and prevent intemperance, as declared by the Board.

It is conceded generally to be within the police power of the State to regulate and control the traffic in and sale of intoxicating beverages and that the Board may, if duly authorized, promulgate, adopt and enforce rules and regulations designed for the reasonable regulation and control of the sale and distribution of alcoholic beverages in the state.

We will consider first the contention that §4301.13 R. C., and the regulations of the Board, are violative of certain provisions of the Federal Constitution. The Twenty-first Amendment to the Federal Constitution repealing prohibition provides as follows:

"Section 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

"Section 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The highest court in the land has by clear announcements in numerous decisions determined that the States have, since the adoption of the Amendment, almost exclusive and unlimited authority in the control and regulation of the importation, distribution and sale of intoxicating beverages.

In State Board of Equalization v. Young's Market Co., et al., 299 U. S., 39, 81 L. Ed., 38 (1936) it is stated in the opinion by Justice Brandies, p. 63:

"The plaintiffs argue that, despite the Amendment, a state may not regulate importations except for the purpose of protecting the public health, safety or morals; and that the importer's license fee was not imposed to that end. Surely the State may adopt a lesser degree of regulation than total prohibition. Can it be doubted that a state might establish a state monopoly of the manufacture and sale of beer, and either prohibit all competing importations, or discourage importations by laying a heavy impost, or channelize desired importations by confining them to a single consignee? * * * There is no basis for holding that it may prohibit, or so limit, importation only if it establishes monopoly of the liquor trade. It might permit the manufacture and sale of beer, while prohibiting absolutely hard liquors. If it may permit the domestic manufacture of beer and exclude all made without the State, may it not, instead of absolute exclusion, subject the foreign article to a heavy importation fee? Moreover, in the light of history, we cannot say that the exaction of a high license fee for importation may not, like the imposition of the high license fees exacted for the privilege of selling at retail, serve as an aid in policing the liquor traffic."

The Supreme Court announced in headnote in Ziffrin v. Reeves, 308 U. S. 132, 84 L. Ed., 128 (1939) that:

"The Twenty-first Amendment sanctions the right of a state to legislate concerning intoxicating liquors brought from without the state, unfettered by the commerce clause."

In the opinion in the Ziffrin case, supra, Justice McReynolds stated in part:

"The Twenty-first amendment sanctions the right of a state to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause. Without doubt a state may absolutely prohibit the manufacture of intoxicants, their transportation, sale or possession, irrespective of when or where produced or obtained, or the use to which they are to be put. Further, she may adopt measures reasonably appropriate to effectuate these inhibitions and exercise full

police authority in respect to them. * * * Having power absolutely to prohibit manufacture, sale, transportation, or possession of intoxicants, was it permissible for Kentucky to permit these things only under definitely prescribed conditions? Former opinions here make an affirmative answer imperative. The greater power includes the less."

The Supreme Court again had the question of the authority of the State under consideration in United States v. Brown Forman Distillers Corporation, 324 U. S., 293, 89 L. Ed. 951 (1945) and it stated in the opinion by Justice Frankfurter p. 300:

"The Twenty-first amendment made a fundamental change, as to control of the liquor traffic, in the constitutional relations between the States and national authority. Before that amendment—disregarding the interlude of the Eighteenth Amendment—alcohol was for constitutional purpose treated in the abstract as an article of commerce just like peanuts and potatoes. As a result, the power of the States to control the liquor traffic was subordinated to the right of free trade across state lines as embodied in the Commerce Clause. The Twenty-first Amendment reversed this legal situation by subordinating rights under the Commerce Clause to the power of a state to control, and to control effectively, the traffic in liquor within its borders. The course of legal history which made necessary the Twenty-first Amendment in order to permit the States to control the liquor traffic, according to their notions of policy freed from the restrictions upon state power which the Commerce Clause implies as to ordinary articles of commerce, was summarized in my concurring opinion in Carter v. Virginia, 321 U. S., 131, 139, 88 L. Ed., 605, 612, 64 S. Ct., 464.

"If a state for its own sufficient reason deems it a desirable policy to standardize the price of liquor within its borders either by a direct price-fixing statute or by permissive sanction of such price-fixing in order to discourage the temptations of cheap liquor due to cut-throat competition, the Twenty-first Amendment gives it that power and the Commerce Clause does not gainsay it. * * *"

The Supreme Court of the United States has in many decisions recognized and sanctioned the right and authority of the States to legislate in the fixing of prices affecting commodities and products in trade and commerce notwithstanding the products and trade may be related to commerce between the States, holding in numerous cases that such legislation was not violative of the due process clause of the Federal Constitution.

A comprehensive pronouncement is found in the headnotes in Nebbia v. New York, 291 U. S., 502, 78 L. Ed., 940:

"4. Neither property rights nor contract rights are absolute, and equally fundamental with either is the right of the public to regulate such rights in the common interest, subject to constitutional restraints.

"5. The Fifth and Fourteenth Amendments do not prohibit governmental regulation for the public welfare, but merely require that the end shall be accomplished by methods consistent with due process.

"8. Where an industry is subject to regulation in the public interest, the due process clause does not prevent the state from correcting mal-

adjustments by fixing the prices of products and commodities of the industry.

"11. The phrase 'affected with a public interest,' as used in decisions upholding public regulation of businesses affected with a public interest, means only that an industry, for adequate reason, is subject to control for the public good.

"12. So far as the due process requirement is concerned, a state is free to adopt and enforce whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by laws aimed at monopolies, or by curbing harmful competition by fixing minimum prices.

"13. Where a law is not arbitrary or discriminatory, the courts cannot deal with the wisdom of the legislative policy or with the adequacy or practicability of the law enacted for forwarding it.

"14. The Constitution does not secure the liberty to conduct a business so as to injure the public at large or any substantial group."

Again, in Olsen v. Nebraska, 313 U. S., 236, 85 L. Ed., 1305, it is stated in part by Justice Douglas:·

"* * * Save for that decision and Morehead v. New York, 298 U. S., 587, 80 L. Ed., 1347, 56 S. Ct. 918, 103 ALR 1445, holding unconstitutional a New York statute authorizing the fixing of women's wages, the subsequent cases in this court have given increasingly wider scope to the price-fixing powers of the states and of Congress. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 74 L. Ed. 524, 50 S. Ct., 200, decided in 1930, upheld the power of the Secretary of Agriculture under the Packers and Stockyards Act to determine the just and reasonable charges of persons engaged in the business of buying and selling in interstate commerce livestock at a stockyard on a commission basis. In 1931 a New Jersey statute limiting commissions of agents of fire insurance companies was sustained by O'Gorman & Young v. Hartford F. Ins. Co., 282 U. S., 251, 75 L. Ed., 324, 51 S. Ct., 130, 72 ALR 1163. A New York statute authorizing the fixing of minimum and maximum retail prices for milk was upheld in 1934. Nebbia v. New York, 291 U. S. 502, 78 L. Ed. 940, 54 S. Ct. 505, 89 ALR 1469. And see Hegeman Farms Corp. v. Baldwin, 293 U. S. 163, 79 L. Ed. 259, 55 S. Ct. 8; Borden's Farm Products Co. v. Ten Eyck, 297 U. S. 251, 80 L. Ed. 669, 56 S. Ct. 453. Cf. Baldwin v. G. A. F. Seelig, Inc., 294 U. S. 511, 79 L. Ed. 1032, 55 S. Ct. 497, 101 A. L. R. 55; Mayflower Farms v. Ten Eyck, 297 U. S. 266, 80 L. Ed. 675, 56 S. Ct. 457. In 1937 Adkins v. Children's Hospital, 261 U. S. 525, 67 L. Ed. 785, 43 S. Ct. 394, 24 A. L. R. 1238, was overruled and a statute of Washington which authorized the fixing of minimum wages for women and minors was sustained. West Coast Hotel Co. v. Parrish, 300 U. S. 379, 81 L. Ed. 703, 57 S. Ct. 578, 108 A. L. R. 1330. In the same year Townsend v. Yeomans, 301 U. S. 441, 81 L. Ed. 1210, 57 S. Ct. 842, upheld a Georgia statute fixing maximum warehouse charges for the handling and selling of leaf tobacco. Cf. Mulford v. Smith, 307 U. S. 38, L. Ed. 1092, 59 S. Ct. 648; Currin v. Wallace, 306 U. S. 1, 83 L. Ed. 441, 59 S. Ct. 379. The power of Congress under the commerce clause to authorize the fixing of minimum prices for milk was upheld in United States v. Rock Royal Co-opera-

tive, 307 U. S. 533, 83 L. Ed. 1446, 59 S. Ct., 993, decided in 1939. The next year the price-fixing provisions of the Bituminous Coal Act of 1937 were sustained. Sunshine Anthracite Coal Co. v. Adkins, 310 U. S. 381, 84 L. Ed. 1263, 60 S. Ct., 907. And at this term we upheld the minimum wage and maximum hour provisions of the Fair Labor Standards Act of 1938. United States v. Darby, 312 U. S. 100, ante, 609, 61 S. Ct. 451, 132 A. L. R. 1430."

In Federal Power Commission v. Natural Gas Pipeline Company of America, 315 U. S. 575, 86 L. Ed. 1037 (1942) it was determined that there was no violation of the 5th Amendment in the regulation of the price of gas and that the power of a State and Congress to regulate prices extends to wholesale as well as retail sales.

It is our conclusion after consideration of many cases decided by the Supreme Court of the nation applicable to the question, that §4301.13 R. C., does not violate either the due process provision or the commerce clause of the Federal Constitution.

It has been determined and announced clearly by the Supreme Court of this State that the Legislature, in the exercise of the police power, may pass laws designed to regulate and control the traffic and sale of intoxicating beverages and that it may delegate authority to the Board of Liquor Control in order to accomplish that purpose. **State, ex rel. Wellerstroem v. Department of Liquor Control of State of Ohio, et al, 129 Oh St 185, 194 N. E. 372; State, ex rel. Zugravu v. O'Brien, 130 Oh St 23, 196 N. E. 664; Frankenstein v. Leonard, 134 Oh St 251, 16 N. E. 2nd, 424; Superior Distributing Co. v. Davis, 132 Oh St 308 (1937), 7 N. E. 2nd 652.**

In State, ex rel. Zugravu v. O'Brien, supra, the headnotes are:

"1. With constitutional limitations, the General Assembly may, in the exercise of the police power, limit or restrict, by regulatory measures, the traffic in intoxicating liquors.

"2. Permits to carry on the liquor business which are issued under the provisions of the liquor control Act are mere licenses, revocable as therein provided, and create no contract or property right.

"3. Where authority to revoke such a permit is conferred upon an executive or administrative officer by legislative enactment with right of appeal to an administrative board, and with provision therein for giving notice to permittee, and for adequate hearing and the summoning of witnesses both before such officer and reviewing board, but without provision for recourse to the courts by appeal or error, such legislation does not amount to a denial of due process of law under the state or federal Constitution."

In the opinion, it is stated in the O'Brien case, supra, as to the police power of the state in the control of intoxicating liquor:

"As an attribute of sovereignty without any constitutional provision conferring it; in fact, it is essential to the existence of government and is asserted to protect the well being of society and maintain the security of the social order. It is invoked by the courts to sustain legislative enactments which are passed to provide for the public health, morals, safety or welfare and which do not contravene any constitutional provi-

sion. The objective of the exercise of the police power is the promotion of the public good.

"Prior to the constitutional prohibition of the liquor traffic the Legislature of this state had power to limit and restrict by regulation the manufacture and sale of intoxicating liquor, in the exercise of the police power. **Bloomfield v. State, 86 Oh St 253, 93 N. E., 309, 41 L. R. A. N. S., 726, Ann. Cas. 1913 D., 629.**

"Since the repeal of constitutional prohibition in the state and nation the same legislative power exists and by its exercise the Liquor Control Act was passed. Under its statutory provisions, natural and artificial persons may engaged in the liquor traffic only to the extent to which they are permitted to do so.

*      *      *      *      *

"The permits of relator were by the terms of the statute issued expressly subject to termination in the way provided. She had therefore mere revocable licenses and no more. Such a permit is not a property right in the constitutional sense and, if it may be considered in the nature of property at all, it is limited in its scope by the same legislative act which gives it existence, and the reservation of the power of termination enters into and becomes a part of the grant of permission to carry on the specific business. It follows that if the permit is terminated in a lawful manner under the provisions of the act creating it, the licensee can not complain as his license to operate was issued to him subject to that contingency. The holdings are uniformly to the effect that such a license does not create a property right within the constitutional meaning of that term, nor even a contract, and that it constitutes a mere permission to engage in the liquor business, which may be revoked in the prescribed legislative manner." (Many decisions in support of the statement quoted are cited by the court in the opinion.)

In State, ex rel. Superior Dist. Co. v. Davis, et al., supra, pertinent headnotes considered applicable here are:

"1. The Ohio Liquor Control Act is a measure designed to regulate and control the traffic in beer and other intoxicating beverages and, to effectuate that purpose, it excludes from engaging in such traffic all persons except those to whom licenses are issued by the Department of Liquor Control pursuant to and under the authority conferred by the law.

"2. The state may either entirely prohibit importations of intoxicating liquors, or it may discourage or limit such importations by laying a heavy impost.

"3. By reason of the provisions of the Twenty-first Amendment of the United States prohibiting the importation of intoxicating liquors into a state in violation of its laws, the exaction of a license fee by a state for the privilege of importing beer cannot be held violative of the commerce clause of the Constitution of the United States.

"4. Statutory provisions and regulations authorized thereby which prohibit or limit the importation of intoxicating liquors, or levy a license fee or tax thereon in excess of that imposed upon liquors manufactured in Ohio, are not violative of the equal protection clause of the federal

Constitution, or of **Section 2, Article I, Ohio Constitution.** A classification recognized by the Twenty-first Amendment cannot be deemed forbidden by the Fourteenth Amendment.

"5. Sec. **6064-67 GC,** authorizing the levy and collection of additional taxes, fees and charges on the products of manufacturers of wines or manufacturers or brewers of beer and other malt liquors manufactured in another state and shipped into this state, in the same proportion or in the same amount as taxes, fees and charges levied and collected in such other state upon or against the products of Ohio manufacturers of wines or manufacturers or brewers are in excess of those levied and collected on the products or manufacturers and brewers of such other state, constitutes a valid exercise of the police power of the state of Ohio under the Twenty-first Amendment of the Constitution of the United States.

"6. The provisions of §6064-67 **GC,** and regulations of the Tax Commission of Ohio adopted pursuant to authority therein conferred, do not constitute a delegation of legislative power and are not violative of **Section 1, Article II, or Section 5, Article XII, Ohio Constitution.**

"7. Sec. **6064-67 GC,** is in pari materia with other provisions of the Ohio Liquor Control Act and, when so construed, is not violative of **Section 5, Article XII, Ohio Constitution,** requiring laws imposing a tax to state the object of the same."

It is stated in the opinion "by the Court" in part in Frankenstein v. Leonard, et al., supra;

"BY THE COURT: The Plaintiff's numerous complaints may be outlined by stating that he claims these statutes are in conflict with **Sections 1 and 19 of Article I, Sections 1 and 26 of Article II, Section 1 of Article IV, Section 1 of Article XIII** and **Section 1 of Article XIX, Ohio Constitution;** also, Sections 8, 9 and 10 of Article I, Section 4 of Article IV, and Clause 2 of Article VI of the Constitution of the United States; and also Articles V, XIV and XXI of the Amendments to the Constitution of the United States.

"Extended discussion is unnecessary inasmuch as most of the contentions of the plaintiff require merely a recital and reapplication of the fundamental and decisive pronouncements already made by this court in the following four cases involving certain provisions of these statutes. In the plaintiff's briefs none of the four is discussed and only one is mentioned.

"Contrary to the present contentions of the plaintiff, this court in the first paragraph of the syllabus in the case of **State, ex rel. Wetterstroem v. Department of Liquor Control,** 129 Oh St 185, 194 N. E., 372, held that 'The Liquor Control Act, §6064-1 et seq, GC, is a special, all-inclusive act controlling traffic in intoxicating liquors * * *.' Later in the case of **State ex rel. Zugravu v. O'Brien,** 130 Oh St 23, 196 N. E., 664, the following three paragraphs appear in the syllabus."

Following the statement above the court cited with approval and quoted the headnotes in the earlier decision of the court in State, ex rel. Superior Distributing Co. v. Davis, supra, and also **Cody v. Leonard,** 132 Oh St 329, 7 N. E. 2d, 649.

We are in accord with the view and statement of the writer of the

opinion in the Blackman case, supra, in reference to the contention that the legislative purpose has not been stated in §4301.13 R. C.:

"The legislative purpose to require the fixing of minimum prices at which wine shall be sold in Ohio is implicit in the language of the section. It is evident that those who handle wine for sale in the course of business do so for the purpose of making a profit. To make a profit there must be a mark-up whether the wine is sold at wholesale or retail. When, then, the Legislature provided that the Board of Liquor Control may determine and fix minimum mark-ups and minimum prices, it was tantamount to declaring the legislative purpose that there should be mark-ups and that there should be minimum prices for the sale of wine." Page 179, Opinion Blackman case, supra.

We are also in full accord with the statement in the opinion of the court in the Blackman case, supra, on the question of the failure of the Legislature to set out and declare standards and rules for the guidance of the Board in fixing mark-ups and minimum prices. See pp. 179, 180, 181. See also Matz, Admr. v. J. L. Cartage Co., 132 Oh St 271, 7 N. E. 2nd, 200. Judge Hornbeck, quoting in his opinion in the Blackman case, supra, a pertinent statement found in the opinion in the Matz case, supra:

"'* * * It is apparent that according to the great weight of authority the Legislature may confer upon administrative boards power to adopt subordinate rules, administrative in character, where the Legislature in conferring the authority has fixed definite standards and rules of guidance. But the rule relaxes somewhat as to the necessity for such limitations and restrictions, where wide power is imperative in law enforcement; and many authorities have held that standards or criteria for guidance are not necessary in cases in which the discretion to be exercised by administrative officers relates to police regulations in the protection of the public morals, health, safety or general welfare."

See also Weber, Appellant, v. Board of Health, etc., 148 Oh St 389, the second paragraph of the syllabus being as follows:

"Where a law relates to a police regulation for the protection of public health, and it is impossible or impractical to provide specific standards, and to do so would defeat the legislative object sought to be accomplished, such law is valid and constitutional without providing such standards.

"Paragraph seven of the syllabus in Matz, Admr. v. J. L. Curtis Cartage Co., 132 Oh St 271, approved and followed."

The decision of the Supreme Court in the case of The L. & M. Investment Co. v. Cutler, et al., 125 Oh St 12, 180 N. E. 379 (cited in the Blackman case), is considered applicable here, in which case it is stated in the opinion, pp. 18 and 19:

"It is an elementary principle of our jurisprudence that in determining whether a law or ordinance is constitutional, every reasonable presumption will be indulged in favor of its constitutional validity, and that it is only when there is a clear incompatibility between the legislative act and the Constitution that the judicial power will refuse to execute it. This principle applies whether the legislative act be a statute or a municipal ordinance. Cincinnati, W. & Z. Rd. v. Commissioners of

Clinton County, 1 Oh St 77; City of Xenia v. Schmidt, 101 Oh St 437, 130 N. E. 24. Eighty years ago in Cincinnati, W. & Z. Rd. Co. v. Commissioners, supra, discussing the question of delegation of power and the conferring of authority for the execution of a law upon an administrative agency, Judge Ranney said (at page 88 of 1 Oh St): "The true distinction, therefore, is, between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made.' And in Yee Bow v. City of Cleveland, 99 Oh St 269, 124 N. E. 132, 12 A. L. R. 1424, this court unanimously held that an ordinance imposing upon an administrative officer (as a prerequisite to the issuance of a license) the duty of ascertaining facts relating to public health did not confer legislative power upon such officer in a conditional sense, although resort might be had to the courts if his conduct should prove to be arbitrarily exercised or palpably unwarranted. In discussing the constitutionality of the creation of boards of appeal and their power to vary the provisions of a zoning ordinance, an author dealing with the subject of zoning states that courts have held 'that not only was it constitutional to create such boards, but the delegation to them, of the right to so vary certain provisions under certain circumstances, was not an unlawful nor an unreasonable delegation of power.' Metzenbaum on Zoning, page 260."

One of the principal contentions of counsel on behalf of a number of firms and associations representing wine interests as Amicus Curiae and in support of the appellant is stated in the brief as follows:

"Said regulations—in fixing minimum prices to advance social control of wine and to eliminate practices in the sale and distribution of wine which cause intemperance and improper usage thereof—is not—a fair trade regulation as required by the statute, and its adoption was without statutory authority, and therefore said regulation is invalid."

We are not impressed that the argument is sound in support of the claimed conflict in purpose or policy, and consider it to be a much too narrow view when the extent of the broad police power of the state in the regulation and control of intoxicating liquor is given consideration. It is our view that there is no conflict in the purpose as declared by the Legislature and as declared by the Board in promulgating the regulations, but that they are consistent and alike, in that both are aimed at the control and regulation of wine, pursuant to the police power, for the protection of the morals, safety and general welfare of the people of the state. It is to be implied that the purpose of fair "trade" regulations and the fixing of minimum prices at which bottled wine may be sold in the State are for the betterment of social conditions and for the protection of the morals, health, safety and welfare of the people.

In 10 O. Jur. 2nd, Section 126, a pertinent statement is made concerning the questions of "Policy, Wisdom, Expediency or Justice" of legislation enacted by virtue of the police power of the State:

"The court approaches the question of constitutionality of legislation without regard to the personal opinions of the judges as to what

the law ought to be or what they think of its purpose and effect. The principle that the judiciary has nothing to do with the propriety, wisdom, policy, or expediency of legislation, is a significant limitation upon the powers of the court in the interpretation of constitutions and the determination of whether or not legislative enactments conform to or violate the provisions of the state and Federal Constitutions. The Court is not concerned with the propriety or policy of legislation but only with the power of the legislative power to enact it.

"The rule, as commonly expressed, is that the judiciary cannot hold laws invalid merely because they are inexpedient, unwise, unjust, generally unreasonable, or arbitrary, immoral, mischievous, or inconvenient in application and enforcement.

"Once the power to legislate on a subject is found to exist in the General Assembly, the wisdom of its exercise is not a judicial question. As is well understood, the remedy for unwise or unjust legislation cannot be administered by the courts. The judiciary may intervene only when it is convinced that the legislative act is incompatible with the provisions of the Constitution."

The foregoing is supported fully by many decisions of the Supreme and Appellate Courts in this State, and the supporting cases are cited by the writers in the footnotes.

It is generally believed that there is no other enterprise or business or commercial activity which is affected with so great a public interest as is that of the manufacture, distribution and sale of intoxicating liquors.

It is therefore considered that particular consideration should be given to the general nature and comprehensive scope of the police power in a determination of the issues presented in the case now before the court.

We therefore quote further from 10 O. Jur. 2nd, in reference to the nature and comprehensive extent of the police power of the State:

"The police power has been described as the most essential, at times the most insistent, and always one of the least limitable of the powers of government. It is the source of the power residing in legislative bodies to enact legislation intended to protect the public safety, the public health, and the public morals.

"The police power is an essential, vital, and inherent attribute of sovereignty. * * *

"Police power has been said to be synonymous with sovereign power; and to be but another name for the power of government. In effect, the police power is said to sum up the whole power of government, all other powers being only incidental and ancillary to the execution of the police power. It is that full, final power that is involved in the administration of law as a means to the administration of practical justice. In its broadest sense it includes all legislation and almost every function of civil government. * * *

"The police power is that large and comprehensive power essential to the preservation of public welfare and safety. In a general sense, the police power is the power to guard public morals, safety, and health, and to promote the public convenience and the common good; the inherent

power in the state which permits it to prevent all things harmful to the comfort, welfare, and safety of society, or to enact laws necessary to protect the order, safety, health, morals, and general welfare of the people of the state. It is the power of government to enact all manner of laws in furtherance of the public safety, health, morals, general welfare, and prosperity of the body politic. It is that inherent sovereignty which it is the right and duty of the government or its agents to exercise whenever public policy in a broad sense demands, for the benefit of society at large, regulations to guard its morals, safety, health, order, or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.

"The police power may be defined as 'authority to establish for the intercourse of the social members of the body politic, with each other, those rules of good conduct and good neighborhood, which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own, so far as is reasonably consistent with a corresponding enjoyment by others,' as the power 'by which persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health, and prosperity of the state,' or as 'that power, conceded to reside in the people's representatives, which is rightfully exercised by the regulation of the use of private property, or so restraining personal action, as to secure, or tend to the comfort, health, or protection of the community.

"The phrase 'police power' has become a convenient expression to indicate that reserved power of government in the states, notwithstanding the due process clause of the Fourteenth Amendment. While this reserved power is usually exercised in matters pertaining to safety, health, and morals, it includes the power to legislate to accomplish any just object of government by appropriate legislation not specifically prohibited." Secs. 329, 330, 331, 334, 10 O. Jur. 2nd, pp. 406, et seq.

The foregoing quoted statement is also fully supported by many decisions of both the Supreme and Appellate Courts in the State, and the cases are cited in footnotes.

We consider it unnecessary to determine whether the evidence received and proffered in the hearing before the Board was, with respect to each item thereof, competent or whether such evidence tended to establish a so-called differential or difference in the cost to wholesalers engaged in the same business, for the reason that in our view such difference would not, if proven, support the charge that the regulations were arbitrary and unreasonable and therefore are invalid.

Also in reference to the claim of a "differential" in costs, we do not believe that the decision of the Supreme Court in **Serrer, d. b. a. H. H. Serrer & Son, Appellant, v. Price, et al., Appellee, 148 Oh St 389,** cited and relied upon has definite bearing in a decision on this appeal for the reason that the "Unfair Cigarette Sales Act" was applicable and controlling in a determination of the issues in that case, as we view it, and for the further reason that we do not consider the facts and circumstances analogous, but that they are distinguishable.

Appellant's assignments of error are overruled and we determine that §4301.13 R. C., is not violative of either the State or Federal Con-

stitutions and that Article VII of Regulation No. 3 and the sections therein are not arbitrary or unreasonable and we therefore shall affirm the judgment of the Court of Common Pleas.

Judgment affirmed and cause remanded.

FESS, J, HUNSICKER, PJ, concur.