WATCHMAKING EXAMINING BOARD (Department of Regulation and Licensing), Appellant, v. HUSAR, Respondent.

*No. 12. Argued December 2, 1970.—Decided January 5, 1971.*
(Also reported in 182 N. W. 2d 257.)

For the appellant the cause was argued by *Charles A. Bleck,* assistant attorney general, with whom on the brief was *Robert W. Warren,* attorney general.

For the respondent there was a brief and oral argument by *John P. Buckley* of Waukesha.

A brief amicus curiae was filed by *Fritschler, Pellino & Protzmann* of Madison, for the Wisconsin Jeweler's Association and Wisconsin Licensed Watchmakers Association.

HEFFERNAN, J.  It is well established in this state that the police power may be properly exercised to limit certain substantial rights of citizens if, in the reasonable legislative judgment, the conduct of individuals must be controlled to protect the general welfare of the community.  In the case of *State ex rel. Saveland Park Holding Corp. v. Wieland* (1955), 269 Wis. 262, 267, 69 N. W. 2d 217, we quoted with approval the following

statement of the New York Court of Appeals in *Wulfsohn v. Burden* (1925), 241 N. Y. 288, 298, 150 N. E. 120, 122:

" 'The [police] power is not limited to regulations designed to promote public health, public morals, or public safety, or to the suppression of what is offensive, disorderly, or unsanitary, but extends to so dealing with conditions which exist as to bring out of them the greatest welfare of the people by promoting public convenience or general prosperity.' "

In a series of opinions since *Saveland,* we have explained the scope of the state's police power and the nature of the public interest that may invoke its exercise.

In *State v. Ross* (1951), 259 Wis. 379, 48 N. W. 2d 460, we upheld an act prohibiting retail sales at less than a statutory minimum markup. The same rationale was followed in *State v. Eau Claire Oil Co.* (1967), 35 Wis. 2d 724, 151 N. W. 2d 634, in which we pointed out that the police power could properly be used to promote the general prosperity of the state by the regulation of economic conditions.

In *Chicago & North Western Ry. Co. v. La Follette* (1969), 43 Wis. 2d 631, 169 N. W. 2d 441, we reviewed some of the criteria which are to be used in determining whether the exercise of police power is unconstitutional. Therein, we pointed out that a statute is presumed to be constitutional and that a heavy burden is placed upon one challenging the constitutionality of a police-power statute. The court's function in such a challenge is not to weigh evidence in the traditional sense, but only to determine whether there is any reasonable basis for the legislative enactment. Nor will this court strike down legislation on the basis of its belief that the statute is good or bad or wise or unwise. If there is any reasonable basis for the exercise of police power by the legislature, the court must uphold the right of the legislature to act.

Ch. 125, Stats., regulates the rights of citizens to engage in a legitimate phase of private enterprise. Statu-

tory enactments and administrative rules have been established to implement these regulations.

Sec. 125.04, Stats., provides that applicants shall be examined for certification by the Board. Applicants are to be "of good moral character, at least 20 years of age and possess such training and experience as the board shall by rule determine to be required."

Sec. 125.05, Stats., provides that the examination:

". . . shall be confined to such knowledge, practical ability and skill as is essential in the proper repairing of watches, and shall include an examination of theoretical knowledge of watch construction and repair, and also a practical demonstration of the applicant's skill in the manipulation of watchmaker's tools."

Sec. 125.07, Stats., provides for the registration of apprentice watchmakers.

Pursuant to the statutes, the Board has adopted certain rules. One of them is WATCH 1.10 Examination (1), which provides that the examinee will be furnished a 17-jewel watch in need of repair, and he will then be obliged to fit a balance staff, true the hairspring, adjust the escapement, and make all needed repairs. Certain other skills are also required to be demonstrated. In addition, he is required to submit to an examination consisting of 50 questions pertaining to the theory of construction and repair of the modern watch.

WATCH 1.08 Applicant's affidavit provides that an applicant for certification file certain affidavits, including evidence of the completion of an apprenticeship of four years or its equivalent in school training and practical experience.

These enactments are presumptively constitutional, and the burden of showing that they are unreasonable and bear no relationship to the public interest rests upon the defendant in this case. If there is any reasonable basis for the exercise of the legislative power, we are obliged to uphold the enactment.

The statutes provide that the applicant must be of good moral character, be twenty years of age, and possess the training and experience required to perform watchmaking skills in the manner prescribed by the Board. A certificate showing the attainment of these standards is required to be placed in the watchmaker's place of business.

From the face of the statute, it is obvious that the legislature sought to protect the public from fraud and incompetence in the field of watchmaking and watch repair. The legislature could reasonably have reached that conclusion and decided that the statute provided a method of protecting the public welfare. The legislature may well have believed that, because of the complexity of watch repair and watchmaking, the average citizen would be at the mercy of the watchmaker when he takes his timepiece in for repair. It would not be difficult for a watchmaker, either by design or by negligent omission, to replace parts which were not in need of repair, to use defective or substandard parts in his repair work, to create latent defects in the watch mechanism, or even to charge for repairs that were, in fact, never made. It is impossible for the average customer to determine whether he has been dealt with fairly and whether the watchmaker has conformed with minimum standards.

The legislature might well have concluded that, in view of these facts, the public could be protected only by the examination of watchmakers and the establishment of standards calculated to insure that workmanlike standards were lived up to. It could well have concluded that it was in the interest of the public to take steps to insure that only men of professional training, of high skills and competence, and of suitable moral character enter and remain in the trade. The legislature could reasonably have assumed that the ordinary contractual obligations which the customer and the watchmaker enter into were insufficient to assure protection of the general welfare.

In *State ex rel. Hickey v. Levitan* (1926), 190 Wis. 646, 656, 210 N. W. 111, we said, "The prevention of fraud is a subject in which the public at large is vitally interested." The protection of the consumer from abuses that might occur as a result of incompetent or unethical practices by watchmakers falls within the scope of the police power which the legislature could employ to regulate the watchmaking trade for the general welfare.

In oral argument, it was pointed out that there was no showing that there were widespread abuses that required the enactment of an all-pervasive system of state regulation. This, of course, goes to the burden of proof, which is not upon the state but upon the party seeking to upset the constitutionality of the statute. The defendant has failed to assume that burden.

In oral argument, it was also pointed out that there were other areas of free enterprise which were obviously of much more concern to the general welfare than watchmaking. The licensing of automobile repairmen was cited as an area in which state regulation, in regard to competence and ethical practices, would serve a far greater need than the licensing of watchmakers. This court, however, has frequently taken the position that the police power need not be exercised to eliminate all abuses, and that the legislature may selectively exercise its power. The fact that the legislature has failed to enact regulations in an area where they are arguably required does not vitiate the exercise of such power in another field where it reasonably considers regulation necessary. Inasmuch as the record is devoid of a showing that no public interest is served by the watchmaker's code and the legislature could reasonably have concluded that the public interest was served, we declare ch. 125, Stats., a constitutional enactment.

Intertwined with the attack on the constitutionality of ch. 125, Stats., is the assertion that the chapter unconstitutionally delegates legislative power to the Board.

The rationale of this attack is not clearly spelled out in the briefs. Apparently, however, the attack is primarily on sec. 125.05, which, in addition to requiring practical skill and theoretical knowledge, authorizes the Board to "make rules and regulations for conducting examinations" and to "define the standards of workmanship and skill." This constitutes a delegation of legislative powers to the Board. This court, however, has long discarded the theory that the legislature cannot delegate a portion of its power to subordinate legislative agencies. In *State ex rel. Wisconsin Inspection Bureau v. Whitman* (1928), 196 Wis. 472, 505, 220 N. W. 929, we delineated the kind of legislative power which may be delegated from that which may not be delegated. We said:

"The power to declare whether or not there shall be a law; to determine the general purpose or policy to be achieved by the law; to fix the limits within which the law shall operate,—is a power which is vested by our constitutions in the legislature and may not be delegated. When, however, the legislature has laid down these fundamentals of a law, it may delegate to administrative agencies the authority to exercise such legislative power as is necessary to carry into effect the general legislative purpose, in the language of Chief Justice MARSHALL 'to fill up the details;' in the language of Chief Justice TAFT 'to make public regulations interpreting the statute and directing the details of its execution.' "

Later cases have stressed not the nature of the power delegated, but the reasonableness of consequent rules in light of the general legislative purpose, and, in addition, have stressed the necessity of procedural safeguards to prevent the abuse of delegated legislative power.

In *Schmidt v. Local Affairs & Development Dept.* (1968), 39 Wis. 2d 46, 56, 158 N. W. 306, this court quoted with approval the language of Professor Davis wherein he said:

" '. . . the batch of cases on delegation of zoning powers demonstrates that the law of delegation would be

strengthened if the courts were to deemphasize the statutory standards and to emphasize the degree of procedural safeguards.' 1 Davis, *Administrative Law Treatise,* p. 113, sec. 2.09."

We pointed out, again quoting from Professor Davis:

" ' . . . Much of the judicial talk about requirement of standards is contrary to the action the Supreme Court takes when delegations are made without standards. The vaguest of standards are held adequate, and various delegations without standards have been upheld . . .
" '
. . .
" 'In the absence of palpable abuse or true congressional abdication, the non-delegation doctrine to which the Supreme Court has in the past often paid lip service is without practical force.' 1 Davis, *Administrative Law Treatise,* pp. 75, 76, sec. 2.01."

In *Schmidt,* we upheld the validity of the delegation of legislative power partly on the basis that there were sufficient safeguards to protect the individual from arbitrary action of the agency. The standards therein conformed to the legislature's purpose in enacting the statute creating the agency. It was also felt therein that the safeguards were sufficient to protect the public against the arbitrary, unreasonable, or oppressive conduct of the agency.

In *Chicago & North Western Ry. Co. v. Public Service Comm.* (1969), 43 Wis. 2d 570, 169 N. W. 2d 65, the power of the public service commission to apportion costs at grade crossings was called into question. In that case, the railroad attacked the statute as an improper delegation of legislative power. We acknowledged that the statute provided no statutory standard for the apportionment of maintenance costs, but acknowledged that, even in the absence of a standard, a rule of reasonableness would apply. We relied on the rationale of *Schmidt, supra,* and the Davis point of view quoted therein. We chose to rely on the existence of procedural and judicial safeguards rather than on specific legisla-

tively enacted standards. We said, at page 578, referring to *Schmidt:*

"It was there pointed out that this court may take a more liberal attitude toward delegations of legislative power to an administrative agency or administrative director, than where the delegation is to the judiciary. This is because 'the legislative agency or director is, in fact, an arm or agent of the legislature itself. The very existence of the administrative agency or director is dependent upon the will of the legislature; its or his powers, duties and scope of authority are fixed and circumscribed by the legislature and subject to legislative change . . . . An administrative agency is subject to more rigid control by the legislature and judicial review of its legislative authority and the manner in which that authority is exercised.' *Schmidt, supra,* at 56, 57."

We further stated in *Chicago & North Western Ry. Co. v. Public Service Comm., supra,* page 581:

"The legislature has declared what the law is to be and has prescribed procedures for carrying it out. The commission must act within the bounds of reason and not oppressively. In the final analysis, the safeguards of legislative control and judicial review effectively control the exercise of the commission's discretion."

A delegation of legislative power to a subordinate agency will be upheld if the purpose of the delegating statute is ascertainable and there are procedural safeguards to insure that the board or agency acts within that legislative purpose. In the instant case, the purpose of ch. 125, Stats., is clearly to protect the consumer from incompetent or unethical persons who hold themselves out to practice the trade of watchmaking. The statute itself sets forth the requirements as to training and experience necessary to obtain a certificate to engage in the trade. The Board is specifically delegated power to make rules and regulations for the definition of the standards of workmanship and skill. The exercise of the power is hedged about with numerous procedural safeguards.

Sec. 125.08, Stats., provides for the revocation of a certificate only upon notice, with charges and specifications to be enumerated, with the right to a hearing, including the confrontation of witnesses, and the right to submit evidence and produce witnesses. A stenographic record is to be kept, and the proceedings are subject to review as provided by ch. 227, the Administrative Procedure Act. These are rather substantial safeguards and comport with the elements of due process. In addition, the Board is a creature of the legislature and subject to its supervisory control. The delegation of legislative power set forth in ch. 125 satisfies the requirements of the constitution.

*By the Court.*—Judgment reversed. Ch. 125, Stats., is declared to be constitutional. Cause is remanded for further proceedings not inconsistent with this opinion.