**EBY–BROWN COMPANY LLC, Plaintiff,**

v.

**WISCONSIN DEPARTMENT OF AGRICULTURE, TRADE AND CONSUMER PROTECTION and its Secretary, James Harsdorf, Defendants.**

**No. 00–C–0718–C.**

United States District Court, W.D. Wisconsin.

Nov. 20, 2001.

David J. Cannon, Milwaukee, WI, for plaintiff.

Stephen J. Nicks, Assistant Attorney General, Madison, WI, for Brancel, Ben, Wisconsin Department of Agriculture, Trade and Consumer Protection, Stephen A. Ditullio Dewitt, Ross & Stevens, Madison, WI, Wisconsin Association of Distributors, Inc.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for declaratory and injunctive relief. Plaintiff Eby–Brown Company LLC, a wholesale, licensed distributer of tobacco products, challenges Wisconsin's Unfair Sales Act, Wis.Stat. § 100.30, which regulates the minimum price distributors and retailers can charge for products, including cigarettes. Plaintiff is seeking a declaration that the Act violates its rights to equal protection and substantive due process and the commerce clause. In addition, plaintiff seeks to enjoin defendants Wisconsin Department of Agriculture, Trade and Consumer Protection and its secretary, James Harsdorf, from enforcing the Act. Subject matter jurisdiction is present under 28 U.S.C. § 1331.

Presently before this court are plaintiff's and defendants' cross-motions for summary judgment. Because I find that the Act does not violate plaintiff's rights to equal protection or substantive due process or the commerce clause, I will grant defendants' motion for summary judgment and deny plaintiff's motion for summary judgment.

From the findings of fact proposed by the parties and from the record, I find the following material facts are undisputed.

## UNDISPUTED FACTS

### A. *The Parties*

Plaintiff Eby–Brown Company LLC is a Delaware company engaged in the wholesale distribution of tobacco products, food products and sundry items. Defendant Wisconsin Department of Agriculture, Trade and Consumer Protection is the entity authorized to enforce the provisions of the Unfair Sales Act pursuant to Wis.Stat. § 93.07. Defendant James Harsdorf is the current secretary of the Wisconsin Department of Agriculture, Trade and Consumer Protection and is responsible for enforcing the Act.

Plaintiff is a licensed cigarette distributor and has done business in Wisconsin since before 1980. In 1999, plaintiff opened a distribution center in Eau Claire, Wisconsin, from which it distributes most of its products in Wisconsin. As part of its business, plaintiff sells to a broad class of customers, including individual retailers, retailers that have combined gas stations and convenience stores, national chain drug stores and national chain grocery stores.

On February 10, 1998, defendants advised plaintiff that they had received a complaint alleging that plaintiff was violating Wisconsin's Unfair Sales Act by selling cigarettes below cost and that defendants were going to commence an investigation, pursue the complaint and enforce the Act against plaintiff. Defendants usually initiate Unfair Sales Act investigations after receiving a written complaint. Since January 1, 1994, defendants has received 143 written complaints alleging sales of tobacco products below either "cost to retailer" or "cost to wholesaler." Thirty complaints were closed after finding no violations; 32 resulted in defendants' issuing warning letters; three resulted in defendants' issuing special orders pursuant to Wis.Stat. § 100.20(3); four were referred to district attorneys for prosecution; 10 are currently in the final stages of investigation and being prepared for recommendations by staff for legal action; and 13 are currently in a preliminary investigative stage.

### B. *Wisconsin's Unfair Sales Act*

The policy behind the Unfair Sales Act, Wis.Stat. § 100.30(I), is stated as follows:

**Policy.** The practice of selling certain items of merchandise below cost in order to attract patronage is generally a form of deceptive advertising and an unfair method of competition in com-

merce. Such practice causes commercial dislocations misleads the consumer, works back against the farmer, directly burdens and obstructs commerce, and diverts business from dealers who maintain a fair price policy. Bankruptcies among merchants who fail because of the competition of those who use such methods result in unemployment, disruption of leases, and nonpayment of taxes and loans, and contribute to an inevitable train of undesirable consequences, including economic depression.

Under the Act, there are essentially two types of cigarette wholesalers: permit holders and jobbers. Plaintiff is a permit holder, also known as a licensed cigarette distributor, because it is allowed to affix tax revenue stamps to cigarette packages. Wis.Stat. § 139.30(3). Jobbers, on the other hand, must purchase tobacco products from a permit holder. Wis.Stat. § 139.30(6). Generally, jobbers service low-volume retail accounts, while permit holders service higher volume accounts. In addition, the Act creates a cigarette wholesaler known as a "multiple retailer," which is defined as "any person who acquires stamped cigarettes from manufacturers or permittees, stores them and sells them to consumers through 10 or more retail outlets which he or she owns and operates within or without this state." Wis.Stat. § 139.30(8). Plaintiff does not know of any Wisconsin multiple retailer who maintains a separate central warehouse to store cigarettes sold to it and who then delivers those cigarettes to its various retail outlets. All of the multiple retailers to whom plaintiff sells cigarettes have plaintiff deliver the cigarettes directly to each retail outlet, who then stores the cigarettes on site at each retail outlet.

When plaintiff and all other cigarette distributors purchase directly from cigarette manufacturers, they are given what the manufacturers refer to as "cash discounts" and "trade discounts." Cash and trade discounts reduce the cost of acquiring cigarettes from a manufacturer.

The Act provides that with respect to the sale of cigarettes, liquor or other tobacco products, the "cost to wholesaler" is, in part, invoice cost less all trade discounts except customary discounts for cash. Wis. Stat § 100.30(2). This section also provides that for a licensed cigarette distributor or a multiple retailer, the "cost to wholesaler" is, in part, the cost charged by the cigarette manufacturer, disregarding any manufacturer's discount or any cash discount. *Id.* In other words, the Act does not allow the deduction of trade discounts when determining "cost to wholesaler" for sales by a licensed cigarette distributor or multiple retailer, but does allow trade discounts for all products other than cigarettes. Defendants have never tried to enforce the Act or validate compliance by using any other definition of "costs" other than "costs to retailer" or "costs to wholesaler" as those terms are defined in Wis. Stat. § 100.30(2).

In any sale in which the seller is not a licensed cigarette distributor, the Act allows a below-cost sale if that selling price is set in good faith to meet the existing selling price of a competitor on the basis of evidence in possession of the retailer or wholesaler in the form of an advertisement, proof of sale or receipted purchaser. Wis.Stat. § 100.30(6)(c).

The Act prohibits both in-state and out-of-state cigarette wholesalers from increasing their market share by selling cigarettes at a price that is lower than the statutory definition of cost to wholesaler. However, by administrative rule, certain allowances, other than cash discounts, may be used by distributors in justifying a lower "cost to wholesaler." For example, in 1988, defendants enacted stamping discount regulations, Wis.Admin.Code

§ ATCP 105.08(3)(b), an administrative rule under the Unfair Sales Act, which reads as follows:

To the extent provided under this paragraph allowances and the state stamping discount under s. *139.32(5)*, Stats., may be deducted from the cost of doing business. If an allowance or the state stamping discount is so used it shall offset expenses incurred when performing the service or providing the item of value; customary discounts for cash payment shall offset interest expenses and other bank charges. These offsets may not exceed the amount of expense incurred for performing the service or providing the item of value that is allocated to cigarettes and other tobacco products.

Generally, a cigarette wholesaler that wishes to increase its market share must do so by providing higher quality service to its customers rather than by selling below the Act's definition of cost.

Section 100.30(3) of the Act prohibits loss leaders:

**Illegality of loss leaders.** Any sale of any item of merchandise either by a . . . wholesaler . . . at less than cost as defined in this section with the intent or effect of inducing the purchase of other merchandise or of unfairly diverting trade from a competitor, impairs and prevents fair competition, injures public welfare and is unfair competition and contrary to public policy and the policy of this section. Such sales are prohibited. Evidence of the sale of any item of merchandise by any . . . wholesaler . . . at less than cost as defined in this section shall be prima facie evidence of intent or effect to induce the purchase of other merchandise, or to unfairly divert trade from a competitor, or to otherwise injure a competitor.

Profit margins in tobacco distribution are low in comparison to other products, hovering at approximately 2.9%. In the 12–month period ending November 2000, plaintiff sold approximately $100 million worth of cigarettes in Wisconsin calculated on the basis of manufacturer's list price. Plaintiff sells to many large national chain retailers and these companies insist on uniform cigarette pricing, subject only to state variations on the basis of tax revenue stamps.

## OPINION

### A. *Standard for Summary Judgment*

To prevail on a motion for summary judgment, the moving party must show that even when all inferences are drawn in the light most favorable to the non-moving party, there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *McGann v. Northeast Illinois Regional Commuter Railroad Corp.,* 8 F.3d 1174, 1178 (7th Cir.1993). Summary judgment may be awarded against the non-moving party only if the court concludes that a reasonable jury could not find for that party on the basis of the facts before it. *Hayden v. La–Z–Boy Chair Co.,* 9 F.3d 617, 618 (7th Cir.1993). If the non-movant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the moving party is proper. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

### B. *Overview of Wisconsin's Unfair Sales Act*

Wisconsin's Unfair Sales Act prohibits selling goods below a statutorily defined cost in order to prevent unfair competition and deceptive advertising. Wis.Stat. § 100.30(1). To determine whether a product is being sold below cost in viola-

tion of the statute, the Act differentiates among products and among sellers in several ways. First, the Act divides alcohol, gasoline and tobacco products into one group and all other products into another group. Wis.Stat. § 100.30(2). The net effect of this distinction is that alcohol, gasoline and tobacco wholesalers and retailers must include either an actual or presumptive cost of doing business in their cost to wholesaler, whereas wholesalers and retailers of all other products need not include it. Including a cost of doing business in cost to wholesaler has the effect of increasing a seller's statutorily defined cost. Second, the Act distinguishes among wholesalers by segregating licensed cigarette distributors and multiple retailers (those who cannot include trade discounts in their cost) from all other wholesalers (those who can include trade discounts in their cost). Id. Third, the Act distinguishes between licensed cigarette distributors who sell to multiple retailers (and cannot include the cost of doing business in their cost) and licensed cigarette distributors who sell to retailers (and must include the cost of doing business in their cost). Id. Finally, the Act separates licensed cigarette distributors from all other wholesalers with respect to selling below cost to meet a competitor's price. Specifically, if a wholesaler is not a licensed cigarette distributor, then it may sell below cost in good faith in order to meet the existing price of a competitor based on evidence in possession of the retailer or wholesaler in the form of an advertisement, proof of sale or receipted purchaser. Wis.Stat. § 100.30(6)(c).

The Act requires that a seller's cost be determined by statutory formulas known as "cost to wholesaler" and "cost to retailer." Wis.Stat. § 100.30(2). Cost to wholesaler for alcohol, gasoline and tobacco consists of two primary components: "cost of merchandise," which is the actual amount the wholesaler pays the manufac-turer (less trade discounts if the wholesaler is not a licensed distributor or a multiple retailer; cash discounts are never allowed for any product or seller), plus the "cost of doing business," which is either the wholesaler's actual cost of doing business or, in the absence of proof of a lesser cost, a presumptive 3% markup. Wis.Stat. § 100.30(2)(c). But the cost of doing business is not included in the cost to wholesaler in sales "at wholesale between wholesalers," in other words, when licensed cigarette distributors sell to multiple retailers. Id. The cost to retailer for alcohol, gasoline and tobacco is the cost of merchandise plus either the retailer's cost of doing business or, in the absence of proof of a lesser cost of doing business, a presumptive 6% markup. Wis.Stat. § 100.30(2)(a). For products other than alcohol, gasoline and tobacco (and for sales to multiple retailers), the cost-of-doing-business markup is not included in either cost to wholesaler or cost to retailer. Wis.Stat. § 100.30(2)(c).

### C. Equal Protection Claims

#### 1. Standard of review for economic legislation

When no suspect class or fundamental right is involved, a rational basis test is used to analyze an equal protection claim. Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993); see also Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 457–58, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (only if statute either interferes with fundamental right or discriminates against suspect class will it have to withstand strict scrutiny). Moreover, equal protection does not require that all persons or entities be dealt with identically. Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966). What it does require is that legislative or administrative distinctions have some relevance to the purpose for which

the classification is made. *Id.* Ordinarily, a properly enacted statute will survive an equal protection challenge if "the legislative classification ... bears a rational relation to some legitimate end." *Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). A rational basis review does not authorize "the judiciary [to] sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller,* 509 U.S. at 319, 113 S.Ct. 2637 (quoting *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (per curiam)). Moreover, the Supreme Court has held that it will not "strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought. For protection against abuses by legislatures the people must resort to the polls, not the courts." *Williamson,* 348 U.S. at 488, 75 S.Ct. 461 (internal citations omitted). " 'The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted.' " *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979) (footnote omitted)).

■ Classifications that do not involve fundamental rights or suspect classes are "accorded a strong presumption of validity." *Id.* at 319–20, 113 S.Ct. 2096. "A legislature that creates these categories need not 'actually articulate at any time the purpose or rationale supporting its classification.' " *Id.* at 320, 113 S.Ct. 2096 (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)).

Instead, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Communications,* 508 U.S. at 313, 113 S.Ct. 2096; *see also Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 526, 79 S.Ct. 437, 3 L.Ed.2d 480 (1959) ("it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause of the Fourteenth Amendment if any state of facts reasonably can be conceived that would sustain it"). Moreover, a legislature is never required "to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096; *see also Nordlinger,* 505 U.S. at 15, 112 S.Ct. 2326.

Wisconsin's Unfair Sales Act was enacted in 1939 and has been amended as recently as 1997. *See* 1997 Act 55, §§ 2 to 27, eff. Aug. 1, 1998. Despite the Act's 62–year history, it has been analyzed in only five reported judicial decisions, .the most recent of which was issued in 1967. *See State v. Eau Claire Oil Co.,* 35 Wis.2d 724, 151 N.W.2d 634 (1967); *Heiden v. Ray's Inc.,* 34 Wis.2d 632, 150 N.W.2d 467 (1967); *State v. Ross,* 259 Wis. 379, 48 N.W.2d 460 (1951); *State v. Tankar Gas, Inc.,* 250 Wis. 218, 26 N.W.2d 647 (1947); *State v. 20th Century Market,* 236 Wis. 215, 294 N.W. 873 (1940). Moreover, its constitutionality has been examined in only two of these cases, *Eau Claire Oil* and *Ross,* and in each case the Act was upheld as constitutional. A few years after *Eau Claire Oil* was decided, the Wisconsin Supreme Court examined a statute regulating the watchmaking trade and upheld it as constitutional as a valid exercise of the state's police power. *Watchmaking Ex-*

amining *Board v. Husar,* 49 Wis.2d 526, 537, 182 N.W.2d 257, 261 (1971). The court cited *Eau Claire Oil* and *Ross,* holding that the scope of the state's police power extends beyond public health to promoting general prosperity by regulating economic conditions. *Id.* at 530, 182 N.W.2d 257. The court pointed out that a police-power statute is presumed constitutional and that the challenging party carries a heavy burden in opposing such a statute. *Id.* "The court's function in such a challenge is not to weigh evidence in the traditional sense, but only to determine whether there is any reasonable basis for the legislative enactment." *Id.*

Instead of analyzing United States Supreme Court, Seventh Circuit or Wisconsin case law regarding the Unfair Sales Act, plaintiff cites several cases from other states. For example, plaintiff cites *Serrer v. Cigarette Service Co.,* 148 Ohio St. 519, 76 N.E.2d 91 (1947), and *Cohen v. Frey & Son,* 197 Md. 586, 80 A.2d 267 (1951), in which Ohio's Unfair Cigarette Sales Act and Maryland's Unfair Sales Act, respectively, were held to violate equal protection because they failed to provide for cost differentials between service wholesalers (those who employ salespersons, extend credit and make deliveries) and cash-and-carry wholesalers (those whose customers come to them and pay cash). However, neither court stated its standard of review and both appear to have used a stricter standard than the required rational basis. The defendants point to subsequent cases in these jurisdictions in which the courts applied a rational basis standard and upheld similar statutes containing cost differentials. *See Pompei Winery v. Board of Liquor Control,* 149 N.E.2d 733 (1956); *Home Utilities Co. v. Revere Copper & Brass, Inc.,* 209 Md. 610, 122 A.2d 109 (1956). Plaintiff argues that in *Pompei* and *Revere* the courts distinguished their holdings explicitly from the earlier cases. In *Pompei,* the court distanced itself from the holding in *Serrer* by stating, without more, that it was reviewing the Liquor Control Act rather than Ohio's Unfair Cigarette Act. *Pompei,* 149 N.E.2d at 750. In *Revere,* the court distanced itself from the holding in *Cohen* by stating, without more, that it was reviewing the Unfair Sales Act of 1941 rather than the Maryland Trade Act. *Revere,* 122 A.2d at 112. The more significant distinction between these cases is that *Serrer* and *Cohen* used a stricter standard of review, while *Pompei* and *Revere* applied the proper standard: rational basis.

Defendants also rely on *Safeway Stores, Inc. v. Oklahoma Retail Grocers Ass'n, Inc.,* 360 U.S. 334, 79 S.Ct. 1196, 3 L.Ed.2d 1280 (1959), in which the Supreme Court applied a rational basis standard of review and concluded that Oklahoma's Unfair Sales Act was constitutional. The Act in *Safeway* prohibited a retailer that did not use trading stamps from cutting its prices in order to compete with other retailers who gave trading stamps as a discount to cash customers. (Trading stamps were coupons issued by retailers to consumers on the basis of dollar value of the item purchased; they were used like cash to redeem various items of merchandise.) The court stated that "this Court will not impose its own economic views or guesses when the State has made its choice" and that "[w]e are not concerned with the soundness of the distinctions drawn. It is enough that it is open to Oklahoma to believe them to be valid as the basis of a policy for its people." *Id.* at 341–42, 79 S.Ct. 1196.

 Plaintiff is not a member of a suspect class and no fundamental right is at issue; Wisconsin's Unfair Sales Act affects economic interests only. Therefore, the Act is subject to a rational basis review and will be upheld if the classifications are

reasonably related to a legitimate government purpose.

### 2. *Plaintiff's equal protection claims*

As a licensed cigarette distributor, plaintiff contends that Wisconsin's Unfair Sales Act is arbitrary, unreasonable and discriminates against it in violation of the equal protection clause of the Fourteenth Amendment because it differentiates among products and sellers in determining cost to wholesaler. Specifically, plaintiff alleges that the Act discriminates: (1) against licensed cigarette distributors and multiple retailers (versus all other wholesalers) because only they cannot deduct trade discounts in their cost to wholesaler; (2) against licensed cigarette distributors who sell to retailers (versus licensed cigarette distributors who sell to multiple retailers) because only those licensed distributors that sell to multiple retailers can exclude the cost of doing business in their cost to wholesaler; (3) against licensed cigarette distributors (versus all other wholesalers) because only they cannot sell below cost in good faith to meet an existing price of a competitor; and (4) against alcohol, gasoline and tobacco wholesalers (versus wholesalers of all other products) because only they must include either a presumptive or actual cost-of-doing-business markup in their cost to wholesaler. In response, defendants argue that the state has the authority to regulate prices in order to prevent unfair competition, economic legislation is presumed to be constitutional and plaintiff has not met the burden of proof required under the rational basis test.

The following chart summarizes the Act's distinctions that plaintiff contends are discriminatory:

| | sales by licensed cigarette distributor | | sales by multiple retailer | sales of alcohol, gas and tobacco | sales of all other products |
|---|---|---|---|---|---|
| | to a retailer | to a multiple retailer | | | |
| trade discounts allowed | No | No | No | Yes | Yes |
| cost-of-doing-business markup required | Yes | No | Yes | Yes | No |
| good faith pricing allowed | No | No | Yes | Yes | Yes |

#### a. Trade discounts

A trade discount is "calculated on the basis of the quantity or dollar amount of merchandise actually purchased or sold" and "is not a customary discount for cash." Wis.Admin.Code § ATCP 105.007(3)(b). Basically, a trade discount is a device used by manufacturers to offer a reduced price to certain customers.

Plaintiff contends that Wisconsin's Unfair Sales Act violates the equal protection clause because it discriminates against licensed cigarette distributors and multiple retailers (versus all other wholesalers) by not permitting them to deduct trade discounts from their cost to wholesaler. First, defendants argue that plaintiff is free to distribute these supposedly favored goods in lieu of cigarettes. *See Nebbia v.*

*New York,* 291 U.S. 502, 520–21, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (rejecting equal protection claim where grocer's minimum price to purchase milk was greater when purchased from dealer as opposed to farmer because grocer was free to purchase from farmer). However, the facts in *Nebbia* are distinguishable from the facts of this case. In *Nebbia,* the grocer needed only to purchase the same product from a different supplier. In this case, although plaintiff currently distributes food products and sundry items, plaintiff would have to shift its $100 million cigarette distribution to other products in order to take advantage of these provisions of the Act. This shift would be much more onerous than simply buying from a different supplier. Second, defendants argue that all licensed cigarette distributors and multiple retailers are treated similarly. This argument is more persuasive because plaintiff competes with other licensed cigarette distributors in the cigarette market; it does not compete with distributors of other products.

Finally, defendants argue that the legislature could have concluded reasonably that cigarettes should be treated differently from all other products. Like cash discounts, trade discounts could be mechanisms for fostering unfair competition in the cigarette market. To illustrate, defendants argue that because profit margins in tobacco distribution are low in comparison to other products, at approximately 2.9%, even very small increases in trade discounts to a favored distributor can give that distributor an unfair advantage. In other words, when profit margins are this tight, there is less leeway for the distributor who received the smaller trade discount to use its profit margin as a means to be competitive. Therefore, the legislature could have concluded that disallowing trade discounts given to licensed cigarette distributors and multiple retailers would advance the purpose of the Act. "Evils in

the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think." *Williamson,* 348 U.S. at 489, 75 S.Ct. 461; *see also Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 465, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("legislature need not 'strike at all evils at same time or in same way' ") (quoting *Semler v. Oregon State Board of Dental Examiners,* 294 U.S. 608, 610, 55 S.Ct. 570, 79 L.Ed. 1086 (1935)).

Plaintiff also alleges that jobbers could take a trade discount if they purchase directly from a permit-holding manufacturer. Although this may be theoretically possible under the statute, defendants argue that jobbers purchase tobacco products only from distributors, not from manufacturers. Notwithstanding any theoretical possibilities, the legislature could have concluded that jobbers do not have the economic resources necessary to engage in the type of cut-throat pricing that would lead to unfair competition because they generally operate small, low volume operations. Thus, it is reasonable for a legislature to allow a jobber to deduct trade discounts, while a high volume licensed distributor is not allowed to do the same. Therefore, a rational basis nevertheless exists for the statutory distinction between a jobber and permit holder.

Because licensed cigarette distributors do not compete in the same market with distributors of all other products and because the legislature could have concluded reasonably that disallowing trade discounts to licensed cigarette distributors and multiple retailers advances the goals of the Unfair Sales Act, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

### b. Sales to multiple retailers

■ Plaintiff contends that the Unfair Sales Act violates the equal protection clause because it discriminates against licensed cigarette distributors who sell to retailers because those distributors who sell to multiple retailers can exclude the cost-of-doing-business markup in their cost to wholesaler. First, defendants argue as they did with trade discounts that plaintiff is free to distribute to multiple retailers instead of retailers in order to capitalize on this supposed benefit. *See Nebbia*, 291 U.S. at 520–21, 54 S.Ct. 505. This argument is more persuasive in this context because plaintiff is not required to change what it distributes but rather the outlets to which it distributes. In addition, plaintiff sells to multiple retailers as well as retailers. Thus, these facts align more closely with the facts and holding in *Nebbia*.

More important, there is a reasonable basis for this legislative classification because it allows for a consistent markup regardless whether a multiple retailer is involved in the chain of distribution. A typical wholesale distribution chain involves three steps and four entities: manufacturer to wholesaler to retailer to consumer. The Act imposes a cost-of-doing-business markup at two stages: wholesaler to retailer (wholesale stage) and retailer to consumer (retail stage). The cost-of-doing-business markup at each stage is either the actual cost of doing business or, in the absence of proof of a lesser cost, a fixed percentage of either 3% at the wholesale stage or 6% at the retail stage. Therefore, the total maximum, presumptive markup is 9% by the time the product reaches the consumer. Requiring the multiple retailer to add its cost of doing business into cost to wholesaler would be duplicative and result in an increased maximum, presumptive markup. The legislature could have reasonably concluded that the maximum, presumptive markup should be the same 9% whether a product passes through a typical three-step, four-entity distribution chain or a chain that also includes a multiple retailer.

Plaintiff concedes that the multiple retailer must add its actual cost of doing business or a presumptive 3%, but argues that multiple retailers have little or no actual cost of doing business because they do not warehouse the product centrally or deliver it to their own retail outlets. Rather, plaintiff alleges, the product is delivered straight from the distributor to the multiple retailer's outlets and because the multiple retailer is not required to store their cigarettes in a central warehouse for redistribution, it incurs minimal bookkeeping costs only. Therefore, plaintiff argues, a distribution chain that includes a multiple retailer actually results in a total markup to the consumer at just slightly above 6% (retail markup of 6% plus the multiple retailer's ministerial bookkeeping costs). In contrast, defendants argue, the cost of doing business for a multiple retailer includes the costs for insurance on inventory, warehousing and delivery whether the product is stored on-site or off-site. Plaintiff acknowledges that when it delivers directly to a multiple retailer's outlets, each outlet stores the delivered cigarettes on-site. (Ironically, this acknowledgment also indicates that plaintiff distributes to multiple retailers and thus can take advantage of this very provision that it alleges is discriminatory and can exclude the cost-of-doing-business markup in its cost to wholesaler for these sales.) It is quite reasonable to conclude that when a retail outlet stores inventory on-site as opposed to in a central warehouse, it nevertheless incurs bookkeeping costs, insurance costs, warehousing costs and even increased delivery costs to the extent that receiving goods at separate locations rather than a central warehouse is costlier to the recipient.

Because plaintiff is free to distribute products to multiple retailers, and in fact does so, and because the legislature could have concluded reasonably that in a distribution chain that includes a multiple retailer, adding the cost-of-doing-business markup at the multiple retailer level rather than the wholesaler level advances the goals of the Unfair Sales Act, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

c. Good faith pricing

▇ Plaintiff contends that the Unfair Sales Act violates the equal protection clause by discriminating against licensed cigarette distributors and multiple retailers because only they cannot sell below cost in good faith to meet the existing price of a competitor. As a preliminary matter, defendants argue that because plaintiff did not plead this claim in its complaint, its motion for summary judgment as to this claim must be denied on this basis alone. In its complaint, plaintiff alleged that the Act discriminated on the basis of "manufacturer's cash payment, payment on receipt and trade discounts" in violation of the equal protection clause. Plt.'s Cpt., dkt. # 2, at 8–9. The complaint contains no mention of alleged violations on the basis of good faith pricing. Although a complaint need only make "a short and plain statement of the claim," Fed.R.Civ.P. 8(a)(2), it "must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). On the other hand, the parties agreed in a joint pretrial conference statement that the nature of the case was that "the statute violates Commerce Clause, Due Process Clause and Equal Protection Clause." Joint Pretrial Conf., dkt. # 14, at 2. In order to determine the claims included in such a general statement, it would be necessary to refer back to the complaint. *See Associated General Contractors, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (court may not assume that defendant has violated laws in ways that plaintiff has not alleged). Because I find that plaintiff did not give defendants fair notice of its good faith pricing claim and the grounds upon which it rests, plaintiff's motion for summary judgment as to this claim will be denied on this basis.

Even if plaintiff's good faith pricing claim met the liberal pleading requirements of Fed.R.Civ.P. 8(a), it fails under an equal protection analysis for two reasons. First, plaintiff cannot show that it was adversely affected or disadvantaged by the alleged benefit granted to all other distributors. The equal protection clause of the Fourteenth Amendment guarantees that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). All licensed cigarette distributors are similarly affected by this provision of the Act; distributors of other products do not compete in the same market as licensed cigarette distributors. *See Nebbia,* 291 U.S. at 520–21, 54 S.Ct. 505 (no showing that order from Milk Control Board had "placed [plaintiff] at a disadvantage, or in fact affected [plaintiff] adversely, and this alone is fatal to the claim of denial of equal protection").

Second, there is a rational basis for the good faith pricing provision. For all products a distributor can meet a competitor's price only when the competitor is selling at or above the statutory minimum price. In other words, under the Act, no wholesaler or retailer of any product can set its price to meet a competitor's below-cost price because this is the very type of price war the statute aims to prevent. *See Heiden v.*

*Ray's Inc.,* 34 Wis.2d 632, 641–43, 150 N.W.2d 467, 471–72 (1967) (good faith pricing provision does not allow wholesaler or retailer to meet competitor's below-cost price); *see also Safeway Stores, Inc. v. Oklahoma Retail Grocers Assoc., Inc.,* 360 U.S. 334, 336–37, 79 S.Ct. 1196, 3 L.Ed.2d 1280 (1959) (preventing grocer from selling product below cost to meet competition illegally selling their products below cost does not deprive grocer of any constitutional right).

Added to the above, (1) all other distributors except licensed cigarette distributors (and multiple retailers) deduct trade discounts and (2) distributors of all other products except alcohol, gasoline and tobacco do not include a cost-of-doing-business markup in their cost to wholesaler. To illustrate, in the distribution of a product other than alcohol, gasoline and tobacco, such as candy, if Distributor A receives a higher trade discount from a manufacturer, it will have a lower cost to wholesaler. As a result, Distributor B (who received a lower trade discount) can meet Distributor A's price in good faith even though Distributor B is selling below its cost to wholesaler. Because a candy distributor is entitled to deduct trade discounts, it follows that it is also given the benefit of the good faith pricing provision, which allows smaller distributors to compete fairly against larger distributors.

Plaintiff argues that with respect to cigarette distribution, trade discounts favor smaller cigarette distributors because they are based on each distributor's relative increase in market share as compared to the distributor's historical market share and the cigarette manufacturer's increase or decrease in market share. To illustrate, plaintiff cites an R.J. Reynolds trade discount program. This program provides that within the states a distributor services if, for example, R.J. Reynolds' sales increased by 1% then a distributor's sales would have to increase by 1% in order to receive the maximum trade discount; conversely, if R.J. Reynolds' sales declined by 1%, a distributor would receive the maximum trade discount as long as its sales did not decline by more than 1%. This example does not persuade me that trade discounts favor smaller distributors. To the contrary, it is just as likely that smaller distributors would have a more difficult time meeting such sales goals because, by definition, they are less diversified because they service fewer retailers.

In contrast to candy distributors who are able to deduct trade discounts, licensed cigarette distributors are not permitted to deduct trade discounts but are required to include a cost-of-doing-business markup (actual or a presumptive 3%) in their cost to wholesaler. As a result, although the cost of merchandise is the same for all cigarette distributors (regardless whether they receive a trade discount), the cost to wholesaler fluctuates depending on a distributor's cost of doing business. Plaintiff argues that it is arbitrary and unreasonable to preclude licensed cigarette distributors from the good faith pricing provision because it should be able to meet a competitor's price on the basis of the cost-of-doing-business differential as reflected in the cost to wholesaler. But because the cost of merchandise is the same among licensed cigarette distributors, allowing one licensed cigarette distributor to lower its price to meet another's price would mean rewarding the inefficient distributor. In other words, allowing a licensed cigarette distributor with a higher cost of doing business to meet the price of a competitor with a lower cost of doing business does not advance the goal of the Act, which is to prevent unfair competition. This type of competition is fair because it promotes efficiency; the distributor should find ways to lower its cost of doing business in order to sell its product at a lower

price. Excluding the licensed cigarette distributor from the good faith pricing provision is consistent with the legislature's adoption of a different measure of cost to wholesaler for licensed cigarette distributors.

Because plaintiff has not shown it has been adversely affected by the good faith pricing provision and because the legislature could have reasonably concluded that disallowing licensed cigarette distributors from using the good faith pricing provision discounts was consistent with its cost to wholesaler formula and advances the goals of the Unfair Sales Act, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

d. Cost-of-doing-business markup

■ Plaintiff contends that the Unfair Sales Act violates the equal protection clause because it discriminates against alcohol, gasoline and tobacco wholesalers by requiring only them and no other wholesaler to include a cost-of-doing-business markup in their cost to wholesaler. As with plaintiffs good faith pricing claim, defendants argue that plaintiff did not allege this claim in its brief. For the same reasons outlined above, I find that plaintiff did not give defendants fair notice of its cost-of-doing-business markup claim and the grounds upon which it rests. Therefore, plaintiff's motion for summary judgment as to this claim will be denied on this basis alone.

Even if plaintiff's cost-of-doing-business claim met the liberal pleading requirements of Fed.R.Civ.P. 8(a), it fails under an equal protection analysis. Plaintiff has not shown that it has been adversely affected or disadvantaged by this classification because all tobacco distributors (and alcohol and gasoline distributors for that matter) are similarly affected by this provision of the Act. *See Nebbia,* 291 U.S. at

520–21, 54 S.Ct. 505. Simply put, distributors of products other than alcohol, gasoline and tobacco do not compete in the same market as tobacco distributors.

Plaintiff argues that if all licensed cigarette distributors must sell at the same price, competition is eliminated and a state-sanctioned monopoly results. Plaintiff ignores the fact that the cost-of-doing-business component of cost to wholesaler is a variable factor that ensures a wholesaler may set its own profit margin, albeit above the statutorily defined minimum cost, in an effort to jockey for market share. Plaintiff need not include the default 3%, but rather can factor in its actual cost of doing business.

As the Supreme Court explained in *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979), economic legislation is valid unless "the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that (a court) can only conclude that the legislature's actions were irrational." Under *Vance,* plaintiff bears a heavy burden when challenging economic legislation. Moreover, the fact that the legislature selects different approaches for different products does not render the Act invalid. *See Williamson,* 348 U.S. at 489, 75 S.Ct. 461 (rejecting equal protection claim where opticians were not subject to same regulations as sellers of ready-to-wears glasses because "[e]vils in the same field may be of different dimensions and proportions, requiring different remedies"). In addition, the legislature may take the reform one step at a time, addressing the problem that seems most acute to the legislative mind. *Id.* "The legislature may select one phase of one field and apply a remedy there, neglecting all others." *Id.; see also American Federation of Labor v. American Sash*

& Door Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222 (1949).

Because plaintiff has not shown it has been adversely affected by the cost-of-doing-business markup and that the legislature need not strike at all evils at the same time or in the same way and may enact legislation in a step-by-step manner, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

### D. Substantive Due Process Claims

#### 1. Claims that fall under equal protection

■ Plaintiff contends that each of its claims violates equal protection and substantive due process. Because it is difficult to place responsible limits on the concept of substantive due process, the Supreme Court has directed the lower courts to analyze claims under more specifically applicable constitutional provisions before moving on to a substantive due process inquiry. Albright v. Oliver, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); see also Illinois Psychological Ass'n v. Falk, 818 F.2d 1337, 1342 (7th Cir.1987) ("substantive due process" is a "durable oxymoron [that] allows persons harmed by state regulation to complain that the regulation is so unreasonable a deprivation of life, liberty, or property that it is unconstitutional even if adopted and applied in conformity with the most rigorous procedural safeguards, so that no denial of due process of law in the usual sense can be shown"). "Where a particular amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that amendment not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Albright, 510 U.S. at 273, 114 S.Ct. 807 (citing Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

Because this court must examine claims under more specifically applicable constitutional provisions, all of plaintiff's unequal treatment claims are more appropriately analyzed under the specific provisions of the equal protection clause rather than substantive due process. Therefore, I need not address plaintiff's unequal treatment claims that were discussed fully in the preceding equal protection section.

#### 2. Cash discounts

■ Although "discounts for cash" or "cash discounts" are not defined in the Act or by administrative rule, they are well recognized terms that refer to a reduction in the price of sale that is given as a reward for prompt payment; it is a financing term and does not reduce the actual price of an item. See American Heritage Dictionary 288 (4th ed.2000) (defining "cash discount" as "reduction in the price of an item for sale allowed if payment is made within a stipulated period"); see also E & H Wholesale, Inc. v. Glaser Bros., 158 Cal.App.3d 728, 734–35, 204 Cal.Rptr. 838 (1984) (cash discount is reward for prompt payment: it does not reduce actual price); Sperry & Hutchinson Co. v. Margetts, 15 N.J. 203, 104 A.2d 310, 312 (Super.Ct.1984) ("The cash discount is a term of payment merely, not a price adjustment; it is a mode of financing, not a reduction in the price.").

Plaintiff recognizes that the Act prohibits all wholesalers (of any product) from deducting cash discounts. Instead, plaintiff focuses on the fact that cash discounts to cigarette wholesalers (consisting of a standard discount and electronic funds transfer discount) are not "true" cash discounts because all cigarette wholesalers are given the same 3.25% standard discount by virtue of their mandatory participation in an electronic funds transfer program. Although plaintiff argues that the

3.25% is the same across manufacturers, it then asserts that it varies by manufacturer when it states that "the current 'standard discount,' depending on the manufacturer, is between 2% and 3.25%—it was 3.25% for most of the year 2000." Plt.'s Reply in Support of Plt.'s Mot. for Summ.J., dkt. # 47, at 16. In any event, I understand plaintiff to argue that the standard discount (the discount for paying cash) and the electronic funds discount (the discount for paying cash via electronic transfer) are both mandatory because the electronic funds transfer program is compulsory. According to plaintiff, because the cash discount that is given to cigarette wholesalers is mandatory, it is not really a financing vehicle, but rather a reduction in the invoice price. Relying on this characterization, plaintiff contends that the cash discount provision of the Act as applied to cigarette wholesalers is arbitrary and unreasonable. I am not persuaded.

According to defendants, not every manufacturer offers the same 3.25% cash discount to wholesalers who authorize payments via electronic funds transfers. To substantiate their position, defendants cite a September 13, 2000 Philip Morris letter, which offered the following discounts: a "standard discount" of 2%, an electronic payment program discount on the basis of "zero days" of 0.75% and a "Wholesale Leaders" discount of up to 46.2 cents per carton of cigarettes. In addition, the Philip Morris letter implies that the discount percentage varies depending on whether the wholesaler authorizes the electronic funds transfer to occur within zero days, two days or seven days. Specifically, the letter states that "[c]ustomers that elect the zero (0) day electronic payment program option earn a 0.75% anticipation allowance, compared to the previous 0.50% anticipation allowance. There is no change to the calculation of our 2–day and 7–day options." Moreover, in plaintiff's response to defendants' motion for sum-

mary judgment, plaintiff acknowledges that the electronic funds discount is a "sliding scale predicated on remitting such EFT in 0 days to 15 days."

Although the parties dispute whether standard discounts are 3.25% across manufacturers or whether electronic transfers are mandatory, these are not genuine issues of material fact that would prevent me from ruling on a motion for summary judgment. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Even assuming that plaintiff's allegations are correct, the 3.25% standard discount is nevertheless a reward for a prompt cash payment, albeit in the form of a compulsory electronic funds transfer. A payment made via electronic funds transfer is essentially the equivalent of tendering cash: the manufacturer receives payment instantaneously and can use the proceeds immediately. Moreover, it is reasonable to conclude that if a wholesaler's bank account had insufficient funds to cover the mandatory electronic transfer, then the wholesaler would not be entitled to either a standard discount or an electronic funds transfer discount. Therefore, it is not arbitrary and unreasonable to treat mandatory standard discounts and electronic funds transfer discounts as financing methods that fall within the definition of cash discounts.

Because I find that the legislature could have concluded reasonably that even mandatory standard discounts and electronic funds transfer discounts are rewards for prompt payment and not a reduction in sales price, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

### E. *Commerce Clause Claim*

The dormant commerce clause, U.S. Const. art. I, § 8, is the corollary of the commerce clause's delegation to Congress of the power to regulate commerce

among the states. "[T]his affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the states to enact legislation affecting interstate commerce." *Healy v. The Beer Institute*, 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). The dormant commerce clause's implied limit on the authority of states to affect interstate commerce reflects "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Id.* at 335–36, 109 S.Ct. 2491. The commerce clause authorizes courts to review state laws that are alleged to advance a state's own interests to the detriment of free-flowing interstate commerce. *See National Solid Wastes Management Ass'n v. Meyer*, 63 F.3d 652, 657 (7th Cir.1995) (citing *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Natural Resources*, 504 U.S. 353, 359, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992)). Such review is conducted in recognition of "the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the individual States within their respective spheres." *Healy*, 491 U.S. at 335–36, 109 S.Ct. 2491. A regulation is discriminatory if it provides "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Systems, Inc. v. Dept. of Environmental Quality of Oregon*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). When the state law attempts to regulate interstate commerce directly or the state law has the effect of favoring in-state economic interests over out-of-state economic interests, generally the law is declared void " 'without further inquiry.' " *National Solid Wastes*, 63 F.3d

at 657 (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). Alternatively, when the state law is neutral on its face or has only indirect or incidental effects on interstate commerce it is valid unless " 'the burden imposed on such commerce is clearly excessive in relation to the putative benefits.' " *Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

 The parties do not dispute that Wisconsin's Unfair Sales Act applies to both in-state and out-of-state cigarette wholesalers and retailers. *See* Wis.Stat. § 100.30(2)(L). Thus, for plaintiff to succeed on its commerce clause challenge, it must show that the Act places an undue burden on the interstate cigarette market that is "clearly excessive" in relation to Wisconsin's state interests that are furthered by the Act. *See Oregon Waste*, 511 U.S. at 99, 114 S.Ct. 1345. Hence, an essential element of plaintiff's case is establishing the effect that the regulations have on interstate commerce.

Plaintiff contends that the Act places an undue burden on interstate commerce because national retailers insist on uniform prices for cigarettes sold in their stores nationwide. Plaintiff's claim fails for several reasons. Plaintiff cannot make a showing of a "clearly excessive" undue burden because, in the age of computers, the Act requires minimal bookkeeping only. Further, applying plaintiff's notion of a clearly excessive undue burden would mean that no state could impose an excise tax on a product because it might require a national retailer to alter its pricing structure and sell within that state at a different price. In an effort to persuade this court that the Act violates the commerce clause, plaintiff analogizes Wisconsin's Un-

fair Sales Act to an unconstitutional Connecticut statute that required out-of-state shippers to affirm that their posted prices were no higher than prices in neighboring states. *Healy,* 491 U.S. at 343, 109 S.Ct. 2491. Plaintiff fails to realize that the statute in *Healy* applied to out-of-state shippers only. In contrast, Wisconsin's Unfair Sales Act applies to both in-state and out-of-state distributors. In addition, although plaintiff alleges that national retailers "insist" on uniform prices, it has not produced any documentary evidence to show that as a result of the Act's pricing structure, national retailers have actually refused to purchase plaintiff's cigarettes or that it has suffered some detriment. Plaintiff concedes that although national retailers "insist" on uniform pricing, this so-called insistence stops short of the state-by-state price variations that are reflected by tax revenue stamps. In other words, national retailers do not really insist on uniform prices because they are amenable to non-uniform pricing as a result of tax revenue stamps.

Plaintiff argues that even if a legitimate state purpose is found, a regulation will not be tolerated if it could be "promoted as well with a lesser impact on interstate activities." *Pike,* 397 U.S. at 142, 90 S.Ct. 844. Plaintiff asserts that the benefits of the Act could be achieved if the Act did not contain provisions disallowing discounts, especially the standard cash discount given to all cigarette distributors. Such a tautological argument is unpersuasive. For reasons stated earlier, disallowing cash discounts advances the goals of the Act and is neither arbitrary nor unreasonable.

Finally, plaintiff argues that another factor to be considered is whether the Act was designed to protect and benefit local interests. Plaintiff's total argument in support of this contention is that "[c]learly the Act does favor local merchants by forcing out-of-state merchants to artificially raise their prices to meet the manufacturer's cost, eliminating their ability to be competitive in the local market. If enforced, out-of-staters will not be able to obtain a toehold in Wisconsin since they cannot be competitive there and are likely to stop doing business in Wisconsin because they will have lost any ability to be competitive there." Plt.'s Reply to its Mot. for Summ.J, dkt. # 47, at 15. Although it is unclear exactly what plaintiff is arguing, it is clear that plaintiff is not expounding on its national-retailers-insist-on-uniform-pricing argument. This local merchant argument is unimportant because in plaintiff's brief in support of its motion for summary judgment, it dedicated only one sentence to its commerce clause claim, specifically arguing that "[t]he Act places an undue burden on interstate commerce since cigarette wholesalers are unable to give uniform cigarette pricing to customers who are national retailers which insist upon a uniform price for cigarettes sold in all of their stores located throughout the country." Plt.'s Mot. for Summ.J., dkt. # 29, at 3. As a result, defendants responded accordingly. But in its reply brief, plaintiff devoted five-and-one-half pages to its commerce clause claim and in doing so, supplemented its original argument with this local merchant argument. Because plaintiff raised this argument for the first time in its reply brief, defendants did not have an opportunity to respond to it. Therefore, I will not consider it. *See James v. Sheahan,* 137 F.3d 1003, 1008 (7th Cir.1998) (arguments raised for first time in reply brief are waived).

Because plaintiff has not shown it has suffered any detriment, concedes that even without the Act national retailers are amenable to purchasing cigarettes with non-uniform prices as long as the variation is the result of the tax revenue stamp and has not provided any documentary evi-

dence showing that the burden imposed on interstate commerce is clearly excessive in relation to the Act's benefits, I will deny plaintiff's motion for summary judgment and grant defendants' motion for summary judgment as to this claim.

### ORDER

IT IS ORDERED that

1. Plaintiff Eby–Brown Company LLC's motion for summary judgment against defendants Wisconsin Department of Agriculture, Trade and Consumer Protection and its Secretary, James Harsdorf, is DENIED;

2. Defendants' motion for summary judgment against plaintiff is GRANTED; and

3. The clerk of court is directed to enter judgment for defendants and close this case.